882 A.2d 944

Leroy LINCOLN, Jr.

v.

STATE of Maryland.

No. 742, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Sept. 14, 2005.

George E. Burns, Jr. (Nancy S. Forster, Public Defender, on brief), for appellant.

Diane E. Keller (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel SALMON, KENNEY, EYLER, DEBORAH S., JJ.

EYLER, J.

A jury in the Circuit Court for Baltimore City found Leroy Lincoln, Jr., the appellant, guilty of conspiracy to commit murder.[1] The court sentenced the appellant to life imprisonment with all but 25 years suspended.

On appeal, the appellant presents one question: Did the circuit court err in denying his motion to suppress his state-

---

1. The jury found the appellant not guilty of first and second-degree murder.

ment to the police? Perceiving no error, we shall affirm the judgment.

## FACTS AND PROCEEDINGS

On February 27, 1995, Leroy Lincoln, Sr., was murdered in his home on East Northern Parkway, in Baltimore City. The cause of death was blunt force trauma to the head.

Lincoln, Sr., was the appellant's father. The appellant was 18 years old when the murder took place. Also at the time of the murder, Lincoln, Sr., was married to Geralene Lincoln, the appellant's mother, although it is not clear from the record whether Lincoln, Sr., and Geralene were living together.

The murder case remained unsolved for several years, until Baltimore City Police Detective Tyrone Francis, of the "Cold Case Unit," reopened the investigation. He tracked down Monique Peterson, who was the appellant's girlfriend at the time of the murder. On August 23, 2003, Francis interviewed Peterson and obtained a tape-recorded statement from her.[2]

Peterson told Francis that, sometime before the murder, she heard Geralene say she wanted to kill Lincoln, Sr. Also, Peterson had had a conversation with the appellant in which he said that he, his mother, and his friend "John," were planning to kill Lincoln, Sr. Peterson identified a picture of one John Ulrich as the friend in question.[3] Peterson further stated that, after the murder, the appellant said his father was dead and that Ulrich had killed him. The appellant told her that he and Ulrich had gone to Lincoln, Sr.'s house and that Ulrich had hit Lincoln, Sr. with the back of an ax handle. The appellant also told Peterson the murder had been carried out so his mother could obtain his father's insurance money.

---

**2.** Peterson had been using aliases and fake birth dates to conceal her identity from the police, to avoid being prosecuted for prostitution and other crimes.

**3.** Throughout the transcripts in this case, the name "Ulrich" is misspelled "Ultrecht." It appears from documents in the record that "Ulrich" is the correct spelling, so that is what we are using.

Francis attempted to interview Ulrich. Ulrich would not give a statement, but did remark, "If you did something with somebody, wouldn't you rather talk to them first before giving a statement?"

By the time the investigation was reopened, the appellant was 26 years old and was living in North Carolina. His mother was living in North Carolina also. They had moved there in late 1995.

As a result of Francis's investigation, the appellant and Geralene Lincoln were arrested in North Carolina, on October 3 and October 6, 2002, respectively. Francis and Detective J.T. Brown, also of the "Cold Case Unit," traveled to that state and, on October 8, 2002, obtained a tape-recorded statement from Geralene. That afternoon, they interviewed the appellant at the Wilkes County Sheriff's Department in Wilkesboro.

The appellant gave oral and tape-recorded statements during that interview. After he was charged, in the Circuit Court for Baltimore City, with murder and conspiracy to commit murder in the death of his father, he moved to suppress the statements, on the ground that they were not voluntarily made.

At the suppression hearing, Francis testified as follows about the interview of the appellant and the statements he made.

The interview took place in a 6x9 room. The appellant was sitting in a chair at the table in the room. He was not handcuffed. Francis ascertained that the appellant was not under the influence of alcohol or drugs and that he was a high school graduate.

Francis advised the appellant of his *Miranda* rights.[4] The appellant initialed and signed the appropriate places on the "Explanation of Rights" form to indicate that he understood

---

4. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

them. He waived his rights and agreed to answer questions without having an attorney present.

According to Francis, neither he nor Brown threatened or coerced the appellant into waiving his rights or giving a statement. During the interview, they did not make any promises to the appellant, or say or do anything to make him think they would advocate for him with the Maryland or North Carolina authorities. They did not otherwise suggest that they might recommend the appellant's release if he waived his rights and gave them a statement. They did not threaten to use or use physical force. During the interview, the appellant never asked to use the bathroom, for medicine, or for food or beverages. The entire interview lasted one hour and 30 minutes, from when the appellant waived his *Miranda* rights through the conclusion of his tape-recorded statement.

At the outset of the interview, Francis told the appellant the detectives were there to discuss Lincoln, Sr.'s murder. He placed two large files for the case on the table in front of the appellant. He told the appellant he was "willing to discuss the contents of the case files" with him. The appellant denied having any knowledge about the murder.

Francis removed three photographs from the files and showed them to the appellant. The first was a photograph of the appellant. On the back was written, in messy script that looks to have been written using an opposite writing hand: "That's Junior whose father he and I killed for Ms. Geralene." The statement was signed, "John Ulrich, 9–6–02." Although worded as if written by Ulrich, the statement, signature, and date all were written by Francis.

The second photograph was of John Ulrich. On the back was written, in print, "This is John[.] Junior Said He Hit Junior's Father in the Head, While They Smoked Weed With Him And Killed Him[,]" followed by the signature and date, "Monique Peterson, 8–22–02." Although seeming to have been written by Peterson, the statement, signature, and date all were written by Francis.

.

The third photograph was of the appellant's mother. On the back was written, in the same messy script on the reverse of photograph one: "That's Ms. Geralene. She set up the murder of Junior's dad." The statement was unsigned, but was dated 9–6–02. This statement and date also were written by Francis. The appellant did not ask Francis who wrote the statement and Francis did not identify the writer.

Francis made plain on direct examination that the writings on the reverse sides of the photographs were "fake," in that, at least for photographs one and two, the statements, signatures, and dates were made to look like they were written by Ulrich and Peterson, respectively, when in fact they were written by him. He testified that the writings were "true," in that the information they conveyed was "[b]ased on what was done in determining the investigation." He acknowledged, however, that Ulrich had not admitted to killing Lincoln, Sr.

According to Francis, after the appellant was shown the photographs and writings on their reverse sides, he continued to deny knowing anything about the murder. He did not make any admissions and his demeanor did not change.

Francis then played for the appellant excerpts of the tape-recorded statement the appellant's mother had given earlier that day. The excerpts did not implicate the appellant in the murder. Francis told the appellant that Geralene in fact had given a statement confessing to the murder and implicating him and Ulrich, however. According to Francis, at that point, the appellant's "shoulders slumped," he "appeared defeated," and he said he wanted to talk about the murder.

The appellant proceeded to tell Francis that, on the night of the murder, he and Ulrich went to Lincoln Sr.'s house, where all three smoked marijuana. Ulrich then produced a wooden ax handle and hit Lincoln, Sr. on the head with it. The appellant left the house, walked outside, and waited for Ulrich to come out.

After making the oral statement, untaped, the appellant made a statement that was tape-recorded, to the same effect. In the taped statement, the appellant said he was speaking

freely and voluntarily and that he had not been made any promises or coerced or threatened. The tape-recorded statement was moved into evidence at the hearing.

The appellant testified about the interview. Much of his version of what happened was rejected by the hearing judge. For example, the appellant complained that he repeatedly requested a lawyer, to no avail, and that Francis told him if he cooperated by giving a statement he would "get to walk." The court discredited that testimony. The appellant acknowledged that he had "freely and willingly provid[ed] the statement," but said he had thought the police considered his involvement in the murder to have been minimal and that Ulrich was their true target.

The appellant testified that Francis showed him his own picture and the picture of Ulrich; and he had thought that the writing on the reverse side of his photograph was by Ulrich and the writing on the reverse side of Ulrich's photograph was by Peterson. He claimed not to have been shown the photograph of his mother or the writing on its reverse side. When asked why he made the oral and taped statements about the murder, he did not cite the writings on the photographs as a reason.

On cross-examination, the appellant acknowledged that he had a prior conviction of possession with intent to distribute crack cocaine.

The hearing court made its ruling the day after the hearing ended, and after the judge had had an opportunity to listen to the tape-recorded statement. The court found that Francis had engaged in "a form of a ruse" that involved "a series of clever misrepresentations" designed to mislead the appellant by "suggesting things to him that ... were sort of consistent with the State's theory of what had occurred[,]" but were not true, and at the same time creating a "sense of security." The court viewed the ruse as probably being "within the range of potential ruses that are acceptable ruses" and not "reach[ing] the level of being impermissible." The court was persuaded,

by the total circumstances, that the appellant's "will was not overborne" and his statement "was voluntary."

## STANDARD OF REVIEW

In reviewing the denial of a motion to suppress, we are limited to the record of the suppression hearing. *State v. Nieves,* 383 Md. 573, 581, 861 A.2d 62 (2004); *Faulkner v. State,* 156 Md.App. 615, 640, 847 A.2d 1216 (2004). We consider the evidence in the light most favorable to the prevailing party, in this case, the State. *State v. Green,* 375 Md. 595, 607, 826 A.2d 486 (2003); *Sellman v. State,* 152 Md.App. 1, 15, 828 A.2d 803 (2003).

We accept the suppression court's findings of first-level fact unless clearly erroneous, giving due regard to the court's opportunity to assess the credibility of witnesses. *Sifrit v. State,* 383 Md. 77, 92–93, 857 A.2d 65 (2004); *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430 (1992). "[B]ecause the issue of voluntariness is a mixed one of law and fact, we undertake a *de novo* review of the trial judge's ultimate determination." *Taylor v. State,* 388 Md. 385, 879 A.2d 1074 (2005).

## DISCUSSION

The appellant contends his statement was involuntary because, after creating an environment that made it appear safe for him to speak, the police deceived him by using fabricated documents about the evidence against him. The State responds that, "in the case at bar, the use of deception was not so extreme as to be necessarily coercive." It asserts that the hearing court correctly determined that the appellant's will was not overborne by the use of deception.

"Only voluntary confessions are admissible as evidence under Maryland law." *Knight v. State* 381 Md. 517, 531, 850 A.2d 1179 (2004). "In order to be deemed voluntary, a confession must satisfy the mandates of the U.S. Constitution, the Maryland Constitution and Declaration of Rights, the

United States Supreme Court's decision in *Miranda,* and Maryland non-constitutional law." *Id.*

■■■■ Under Maryland non-constitutional law, "[a] confession is voluntary if it is 'freely and voluntarily made' and the defendant making the confession 'knew and understood what he [or she] was saying' at the time he or she said it." *Knight, supra,* 381 Md. at 531–32, 850 A.2d 1179 (quoting *Hoey v. State,* 311 Md. 473, 480–81, 536 A.2d 622 (1988)).

> Otherwise stated, the test of the admissibility of [a] confession is whether [the accused's] will was overborne at the time that he confessed, or whether his confession was the product of a rational intellect and a free will, ... or whether his statement was "freely self-determined,".... So that ... the question is not whether the accused was frightened, but whether his disclosures to the officers were freely and voluntarily made at a time when he knew and understood what he was saying.

*State v. Tolbert,* 381 Md. 539, 558, 850 A.2d 1192 (2004) quoting *State v. Hill,* 2 Md.App. 594, 601–02, 236 A.2d 27 (1967). Likewise, "in order to pass federal and Maryland constitutional muster, a confession must be voluntary, knowing, and intelligent." *Harper v. State,* 162 Md.App. 55, 72, 873 A.2d 395 (2005). Upon a proper challenge, the State bears the burden of showing, affirmatively, that the defendant's inculpatory statement was made freely and voluntarily; and must so prove by a preponderance of the evidence, if the challenge is made pretrial. *Winder v. State,* 362 Md. 275, 306, 765 A.2d 97 (2001).

■■■■ Ordinarily, we look to the "totality of the circumstances" in determining whether a statement was given voluntarily. *Knight, supra,* 381 Md. at 533, 850 A.2d 1179. Among the non-exhaustive list of factors to be considered in determining voluntariness are the defendant's age, physical condition, mental capacity, background, intelligence, education, and experience; the length of the interrogation and the number of officers present; and the manner in which the interrogation was conducted. *Winder, supra,* 362 Md. at 307, 765 A.2d 97.

■ Not all of the multitude of factors that may bear on voluntariness are necessarily of equal weight. *Williams v. State*, 375 Md. 404, 429, 825 A.2d 1078 (2003). The Court of Appeals has held that, when a confession is "preceded or accompanied by threats or a promise of advantage," those factors are "transcendent and decisive," and the confession will be deemed involuntary "unless the State can establish that such threats or promises in no way induced [it]." *Id. See also Taylor*, supra, slip op. at 18; *Knight, supra*, 381 Md. at 533, 850 A.2d 1179; *Winder, supra*, 362 Md. at 309, 765 A.2d 97; *Hillard v. State*, 286 Md. 145, 153, 406 A.2d 415 (1979).

■ Other factors, such as creating an atmosphere that is conducive to making a statement, in that it appears safe and friendly, do not automatically render a confession involuntary.

In *Rowe v. State*, 41 Md.App. 641, 644, 398 A.2d 485 (1979), we rejected the defendant's assertion that his statement was involuntary because "the atmosphere surrounding the interrogation was too compatible." (Emphasis omitted.) There,

> the interrogating officer explained to the [defendant] that the officer had known what a "no good son-of-a-bitch" the victim had been, and "that the only thing that we wanted to do really was to shake the hand of the man that murdered him...." With a classic non-verbal act which in itself might have constituted a confession, the [defendant] offered his hand to the officer.

*Id.* (internal footnote omitted). The defendant argued that the officer's statement was proscribed "psychological coercion." Disagreeing, we stated, "An enticement is only improper when 'the behavior of the State's law enforcement officials was such as to overbear [the appellant's] will to resist and bring about confessions not freely self-determined....' " *Id.* at 645, 398 A.2d 485 (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)).

Likewise, in *Fuget v. State*, 70 Md.App. 643, 651, 522 A.2d 1371 (1987), this Court rejected the defendant's argument that he was coerced into making a statement because he was "deceived by '[the officer's] smile along with coddling words

and ... sympathetic sounds.' " We observed that, "[t]hough the interrogation technique employed by [the officer] may have been somewhat unique, we are unwilling to conclude that her smile, coddling words, or sympathetic sounds coerced the [defendant] into making an incriminatory statement." *Id.* at 652, 522 A.2d 1371.

The use of deception by the police also is a factor to be considered in determining whether, given the totality of the circumstances, the defendant's will was overborne. Trickery or deceit "short of an overbearing inducement is a 'valid weapon of the police arsenal.' " *Ball v. State,* 347 Md. 156, 178, 699 A.2d 1170 (1997) (citation omitted).

In *Ball,* the defendant argued on appeal that a police detective had used "psychological coercion" to obtain his confession to a murder. The detective wrote out two scenarios of how the murder had taken place, one of which implicated the defendant as the killer, but portrayed him positively, and the other of which implicated him as the killer, but portrayed him negatively; the defendant reacted by confessing to the positive portrayal. Concluding that there was "no indication that [Ball's] will was overborne" by the police tactic, the Court observed:

> A confession clearly is not voluntary if it is the product of physical or psychological coercion. A person who has committed an illegal act, however, is not always eager to admit his or her wrongdoing. *Police officers, charged with investigating crimes and bringing perpetrators to justice, are permitted to use a certain amount of subterfuge, when questioning an individual about his or her suspected involvement in a crime.*

*Id.* at 178–79, 699 A.2d 1170 (internal citations omitted) (emphasis added).

The Court of Appeals has warned, however, that, although "[a] degree of police deception to obtain a confession is tolerated," there are "limits to the type of police deception which will be tolerated without rendering a confession involuntary, particularly with regard to deception concerning consti-

tutional rights." *Lewis v. State*, 285 Md. 705, 721–722, 404 A.2d 1073 (1979). In that case, the defendant was interviewed by the police on and off for two days about the murder of his wife and daughter, during which the police allegedly told him that, "if he requested a lawyer he would be labeled a murderer"; and that "asking for a lawyer amounted to an admission of guilt," accusations the police denied. *Id.* at 720–21, 404 A.2d 1073. The trial court never resolved the factual dispute over whose story it believed about the interrogation, and the Court of Appeals reversed Lewis's conviction on another basis. In doing so, it found "[p]articularly troublesome" "the allegations of the police mis-statements concerning requests for an attorney." *Id.* at 720, 404 A.2d 1073.

In a number of cases, this Court has held that confessions were voluntarily obtained notwithstanding the use of deceptive police tactics. In *Hopkins v. State*, 19 Md.App. 414, 424, 311 A.2d 483 (1973), we held that the defendant's statement was voluntary even though it was given in reliance on an interrogating officer's false representation that an accomplice had confessed and implicated him. (Citing *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding that confession was voluntary when police falsely told the defendant that his associate had confessed).) Likewise, in *Watkins v. State*, 59 Md.App. 705, 718, 478 A.2d 326 (1984), we upheld a confession obtained after a police detective falsely told the defendant that his confederates had implicated him in the murder.

In *Finke v. State*, 56 Md.App. 450, 489–90, 468 A.2d 353 (1983), we held that the defendant's confession to murder was voluntary even though the interrogating officer told him numerous lies about the state of the evidence against him: that he had failed a polygraph test; that his three-year-old cousin could identify him as the killer; that his fingerprints were recovered from the crime scene; that two eyewitnesses had seen him enter the house where the murder was committed and two eyewitnesses had seen him leave; and that "according to an expert he would be unable to remember the incident[.]"

More recently, in *Whittington v. State*, 147 Md.App. 496, 525–27, 809 A.2d 721 (2002), we held that a defendant's confession was voluntary even though an interrogating officer staged a fake "blow back" test, in which a police evidence technician purported to show the defendant, scientifically, that she had gunshot residue on her hands, and even though the defendant was told, falsely, that she had "failed miserably" a "polygraph test." The defendant confessed 15 hours after the "blow back" test was administered.

This Court rejected the defendant's contention that "police deception with regard to the use of bogus scientific procedures is inherently more coercive than other forms of deception" and therefore should render consequent confessions involuntary *per se*. *Id.* at 518, 809 A.2d 721. We disagreed, adhering to "the totality of the circumstances" test for voluntariness and concluding that the "total circumstances" in that case, including the fake gunshot residue test and the passage of time between the test and the confession, showed that the defendant's confessions had been made freely and willingly.

In the case at bar, the appellant concedes that "[s]ome deception is permitted in police interrogations." He argues, however, that the deception used by the officers against him, which he characterizes as "the creation of false documents," "is about as bad an instance of deception as can be found," and should be a transcendent factor that renders his statement involuntary *per se*. He relies upon *State v. Cayward*, 552 So.2d 971 (Fla.Dist.Ct.App.1989).

*Cayward* was an appeal by the State from a ruling suppressing the defendant's confession to sexually assaulting and murdering his five-year-old niece. The police had interrogated the 19–year–old defendant using phony scientific reports they had fabricated, one on stationery of the Florida Department of Criminal Law Enforcement, and the other on stationery of Life Codes, Inc., a scientific testing organization. The reports stated, falsely, that the defendant's semen had been found on the victim's underwear. The defendant repeatedly

denied involvement in the crime until he was confronted with the fake reports, at which point he admitted his involvement.

The Florida Court of Appeals affirmed the suppression ruling. It agreed with the State that, generally, police use of deception does not render a confession involuntary *per se*, and voluntariness is assessed based on the total circumstances surrounding the confession. It held, however, that the "intrinsic distinction" between police use of verbal misrepresentations and police use of manufactured documents requires a "bright-line" rule that says "that the type of deception engaged in here has no place in our criminal justice system." *Id.* at 973–74.

The court offered three reasons to support adopting a bright-line rule. First, it opined that a "tangible, official looking report[ ]" "purport[ing] to be authoritative" is more likely to "impress" a suspect, when presented to him in the "atmosphere of confrontation" that exists during police interrogation, and hence is inherently coercive psychologically, much as the threat or application of force is inherently coercive physically. *Id.* at 974. Second, while the suspect and the public expect that the police will use some deception in interrogations, they do not expect that police will manufacture documents to induce confessions: "This is precisely one of the parade of horrors civics teachers have long taught their pupils that our modern judicial system was designed to correct." *Id.*

Finally, the court expressed practical concerns about the police use of false documents "beyond the inducement of a confession"; namely that, "[u]nlike oral misrepresentations, manufactured documents have the potential of indefinite life and the facial appearance of authenticity. A report falsified for interrogation purposes might well be retained and filed in police paperwork. Such reports have the potential of finding their way into the courtroom[,]" and otherwise being mistakenly accepted as authentic. *Id.*

In *State v. Patton*, 362 N.J.Super. 16, 49, 826 A.2d 783 (2003), the New Jersey intermediate appellate court, relying on *Cayward*, held that the defendant's confession, which was

elicited by use of "police-fabricated tangible evidence," was involuntary. The defendant was brought in for questioning about a shooting, and was held for 19 hours before he was interrogated. Between the time of the arrest and the interrogation, the police manufactured an audiotape of an "eyewitness" identifying the defendant as the shooter. In fact, the "eyewitness" was a police officer posing as a witness to the crime. The "eyewitness" recounted the version of events the police had come to believe, from their investigation, had happened. To lend authenticity to the statement, the "eyewitness" spiced the account with other information about the defendant that was true, including information about prior bad acts he had committed, some against the same victim. When the defendant heard the tape, he confessed on the spot.

The appellate court reversed the conviction, holding that the confession had been induced by improper psychological coercion, in violation of the defendant's due process rights. *Id.* The court concluded that the use of police-fabricated documents rendered the confession involuntary *per se. See also State v. Farley,* 192 W.Va. 247, 257 n. 13, 452 S.E.2d 50 (1994) (commenting in *dicta* that court would "draw a demarcating line between police deception generally, which does not render a confession involuntary *per se,* and the manufacturing of false documents by the police, which 'has no place in our criminal justice system'" (quoting *Cayward, supra,* 552 So.2d at 974)).

Other courts have declined to adopt the bright-line rule drawn in *Cayward,* however. In *State v. Von Dohlen,* 322 S.C. 234, 471 S.E.2d 689 (1996), the police showed the defendant a "composite sketch" of himself to make him think they had an eyewitness to the murder he was being questioned about. In fact, the "composite sketch" was drawn by a police artist looking at the defendant through a one-way window in the interrogation room. The defendant also was shown spent shell casings that the police falsely told him had been found at the crime scene. The defendant maintained his innocence after being confronted with those items, but confessed about an hour and a half later.

The court agreed with the defendant that the police tactics were "reprehensible." *Id.* at 243, 471 S.E.2d 689. Without drawing any distinction between written and verbal misrepresentations of the evidence, the court applied the totality of the circumstances test, and concluded that "the present record simply does not sustain [the defendant's] claim that his will was overborne, so as to render his confession involuntary." *Id.*

In *Sheriff, Washoe County v. Bessey,* 112 Nev. 322, 914 P.2d 618 (1996), during interrogation about the sexual assault of a minor, a police officer presented the defendant with a false crime lab report, prepared by the police, showing that the defendant's semen was found on the couch at the apartment where the assault took place. In fact, the police did not have any scientific evidence linking the defendant to the crime. When shown the fabricated report, the defendant made a number of inculpatory statements. The trial court suppressed the statements from evidence.

In an appeal by the State, the Supreme Court of Nevada reversed, holding that the statements were not involuntary. *Id.* at 327, 914 P.2d 618. The court drew a distinction between the use of a deliberate falsehood *intrinsic* to the facts of the alleged offense (*i.e.,* a lie about the existence of incriminating evidence) and the use of a deliberate falsehood *extrinsic* to the facts of the alleged offense, of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt (*i.e.,* a promise or threat about preferential or detrimental treatment by the authorities, that welfare benefits or mental health treatment will be given or withdrawn, or of benefit or harm to someone) and held that the former is one item to be regarded in the totality of circumstances relevant to voluntariness, while the latter will be regarded as coercive *per se. Id.* at 326–27, 914 P.2d 618 (citing and applying *State v. Kelekolio,* 74 Haw. 479, 849 P.2d 58 (1993), and *Holland v. McGinnis,* 963 F.2d 1044 (7th Cir.1992)).

The *Bessey* court declined to place emphasis, as the *Cayward* court had, on the use of written rather than verbal misrepresentations by the police, calling the distinction one without a real difference. It criticized the *Cayward* court for ignoring what the *Bessey* court viewed as the basic test for voluntariness of confessions: whether the deception, whatever its nature, would have induced a false confession under the circumstances.[5] The court further disagreed with the *Cayward* court's concerns about the "indefinite life" of fabricated documents and their potential for being misused or mistaken for real. It reasoned that the rules of evidence work to differentiate between authentic and fabricated documents, and so although "[f]alse documents may 'go astray,'... our evidentiary rules are designed to prevent their use in our legal forums." 112 Nev. at 327, 914 P.2d 618.

Holding that the police detective's use of the falsified lab report "went to the strength of the evidence against [the defendant], a consideration intrinsic to the facts of the alleged offense[,]" *id.* at 326, 914 P.2d 618, the court in *Bessey* concluded that the voluntariness of the confession was to be assessed under the totality of the circumstances standard. It found that, applying that standard, the defendant's statements were not involuntary. "The false report would not have implicated any concerns on [the defendant's] part other than consideration of his own guilt or innocence and the evidence against him. There is nothing about the fabricated document presented to [the defendant] in this case which would have produced a false confession." *Id.* at 327, 914 P.2d 618.

In *Arthur v. Commonwealth*, 24 Va.App. 102, 105, 480 S.E.2d 749 (1997), the police prepared " 'dummy' reports"

---

**5.** Maryland non-constitutional law cases discuss voluntariness in terms of whether the defendant's statement was made freely, with knowledge and understanding of what he was saying, or whether it was made because his will was overborne, *see, e.g., Knight, supra,* 381 Md. at 531–32, 850 A.2d 1179; and not more specifically in terms of whether the statement obtained is reliable. How these concepts relate and intersect is not an issue in this case. The *Bessey* court's emphasis on reliability as the touchstone of voluntariness does not make its rejection of the *Cayward* court's bright-line rule any less persuasive to us.

showing that a fingerprint and hair found at the scene of a murder matched the defendant's. A police detective confronted the defendant with the fake reports, but he continued to deny that he had been at the scene of the murder. He did confess, however, after the detective told him that the police and the victim's family believed that he loved the victim and that the killing was unintentional, and that the victim's family wanted to know what had happened.

On appeal, the defendant urged the court to "draw a 'bright line' where false *documents* are used." *Id.* at 107, 480 S.E.2d 749 (emphasis in original). The court rejected that approach in favor of the totality of the circumstances test, and concluded that the use of the fabricated fingerprint and DNA reports "did not overcome [the defendant's] will or critically impair his capacity for self-determination." *Id.* at 108, 480 S.E.2d 749.

The Maryland appellate courts have not been confronted with a case in which a police-fabricated document was used in an interrogation that produced a confession. In *Whittington, supra,* which, as we have discussed, involved the use of a phony test, but not phony documents, we commented about the *Cayward* opinion as follows:

> At the outset, we note that there are important distinctions between this case and *Cayward.* The test results in *Cayward* clearly induced the defendant to confess. In contrast, the appellant did not immediately confess when she learned of the results of the "blow back" gun test. Moreover, the court's decision in *Cayward* was partly rooted in its deep concern about the potential for misuse of a written memorialization of a fake scientific test, as well as the "indefinite life" of such documentary evidence. In this case, however, no documents were fabricated, so the concerns of the *Cayward* court are not implicated.

147 Md.App. at 518, 809 A.2d 721.

The appellant urges us to establish a bright-line rule, as the *Cayward* court did, that police deception by use of fabricated documents is a transcendent factor that is so inherently psychologically coercive that it makes a resulting confes-

sion involuntary *per se*. We decline to do so. We shall hold that the use of a police-fabricated document as a ploy to deceive a defendant into thinking the State has evidence of guilt, or greater knowledge than it actually has, is a relevant factor to be considered in deciding whether, in the totality of the circumstances, the defendant's confession was freely and voluntarily made; but it is not, in and of itself, dispositive of the issue.

We do not find merit in the central assumption underlying the *Cayward* court's bright-line rule: that a false statement about the state of the evidence, presented in writing, necessarily exerts such influence over a suspect's mind so as to overcome his free will when the same false statement, presented verbally, does not. It is well settled that when the police deceive a suspect by telling him, falsely, that other suspects have given written statements targeting him in the crime, that deception is not trickery that, in and of itself, will render the suspect's later inculpatory statements involuntary. *See Hopkins, supra,* 19 Md.App. at 424, 311 A.2d 483, and *Watkins, supra,* 59 Md.App. at 718, 478 A.2d 326. *See also Commonwealth v. Jones,* 457 Pa. 423, 433–34, 322 A.2d 119 (1974) (police falsely told defendant that his co-defendant had given a statement against him). *Cf. United States v. Velasquez,* 885 F.2d 1076, 1087–89 (3rd Cir.1989) (police falsely told the defendant that her accomplice had given a statement against her). If the same false information were to be communicated in writing, the *Cayward* court's bright-line rule would automatically ascribe a coercive effect to it.

Not all fabricated documents carry the same weight of authority and have the same influential power to affect thinking, however, and therefore not all deceptions involving fabricated documents should be treated identically. Fabricated documents may run the gamut in appearance from seemingly official and authentic, on the one hand, to amateurish in their fakery, on the other. In addition, the circumstances of the interrogation and the facts peculiar to the suspect's background, including his level of education and past experiences

with law enforcement, may affect how he perceives the document and whether it has any effect on his will.

It is a simplistic generality that a written false assertion by the police, regardless of its substance, always will have a greater impact on a suspect's thinking than an oral assertion, and that every written false assertion by the police will have precisely the same coercive effect as all other false written assertions by the police. If our objective in applying the law of confessions merely were to discourage the practice of police deception by use of fabricated documents in interrogation, the generality would be helpful, because it furnishes the rationale for an exclusionary rule. Our objective is more focused, however: it is to ensure that inculpatory statements only are admissible in evidence if they are given voluntarily, as the product of free will. The generality is not useful for this purpose, because its application will render inadmissible both voluntary and involuntary statements alike.

We also are not persuaded by the *Cayward* Court's rationale that, because fabricated documents have a potential for indefinite life, their admissibility into evidence in a hearing or trial raises the specter that they will be mistakenly used, in some other context, as real. This consideration overlooks that the fabricated documents used as part of a police ruse will be identified as such in the litigation of the case to which they apply; that they will not become part of the evidence as disembodied items but as exhibits to testimony explaining their creation and use; and that the rules of evidence are designed to prevent the use of fabricated or unauthenticated documents as genuine documents.

We find the reasoning of the court in *Bessey* more sound, and more compatible with the Maryland non-constitutional law of confessions, than the bright-line rule approach of the court in *Cayward*. The *Bessey* court rejected a rule that treats a police lie "embodied in a piece of paper" as necessarily coercive, 112 Nev. at 327, 914 P.2d 618, instead tailoring the test to be used for voluntariness around the substance of the falsehood: whether the falsehood was about the facts of the crime or the evidence or strength of the evidence against the sus-

pect, in which the totality of the circumstances test applies; or whether the falsehood was about a topic apart from the crime that would be likely to influence the suspect to make a confession regardless of guilt.

The *Bessey* court relied on the reasoning of the Seventh Circuit in *Holland v. McGinnis, supra,* 963 F.2d 1044, which we also find compelling. In *Holland,* the defendant confessed to a rape after he was told by interrogating officers that other police in the jurisdiction where the rape occurred had filed a report identifying a witness who saw the defendant's car at the scene. In fact, no such police report, or eyewitness, existed. Rejecting the defendant's complaint that the deception rendered his confession involuntary, under a totality of the circumstances analysis, the Seventh Circuit observed:

> Of the numerous varieties of police trickery . . . a lie that relates to the suspect's connection to the crime is the least likely to render a confession involuntary. Such misrepresentations, of course, may cause a suspect to confess, but causation alone does not constitute coercion; if it did, all confessions following interrogations would be involuntary because "it can almost always be said that the interrogation caused the confession." Thus, the issue is not causation, but the degree of improper coercion, and in this instance the degree was slight. *Inflating evidence of [the defendant's] guilt interfered little, if at all, with his "free and deliberate choice" of whether to confess, for it did not lead him to consider anything beyond his own belief regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime. In other words, the deception did not interject the type of extrinsic considerations that would overcome [the defendant's] will by distorting an otherwise rational choice of whether to confess or remain silent.*

963 F.2d at 1051 (internal citations omitted) (emphasis added).

Likewise, under Maryland non-constitutional law, the factors that' the Court of Appeals has identified as "transcendent and decisive," so as to render a confession involuntary (so long

as the State cannot prove an absence of a causal nexus between the factor and the confession), have been extrinsic to the facts of the case, the evidence against the suspect, and the strength or supposed strength of the evidence against the defendant: the use or threat of force or lack of protection against force and improper promises of advantage and leniency.[6] The holdings recognize implicitly what the Seventh Circuit commented upon expressly in *Holland,* that extrinsic considerations introduced into a police interrogation are more likely to direct a suspect's thought process about whether to confess away from a rational self-evaluation to an irrational exercise that is no longer the product of free thought. The *Cayward* bright-line rule about the use of fabricated writings as ruses elevates the form of a deception over its substance and overlooks the common thread about extrinsic inducements that runs through the Maryland common law of confessions.

We hold that the use by police of fabricated documents as a means to trick a suspect about the evidence against

---

**6.** *See Taylor, supra,* slip op. at 20 (holding that interrogating officer's statement to suspect that, if the suspect gave a statement, he would inform a District Court Commissioner of his cooperativeness and make a recommendation to the commissioner was an improper promise); *Knight, supra,* 381 Md. at 536, 850 A.2d 1179 (holding that interrogating officer's statement to suspect that, "if down the line, after this case comes to an end, we'll see what the State's Attorney can do for you, with your case, with your charges," was an improper promise to exercise advocacy on the suspect's behalf that would have rendered statement involuntary, except that State proved the absence of reliance); *Winder, supra,* 362 Md. at 317–18, 765 A.2d 97 (holding that interrogating officer's statement that he would try to give the suspect protection from angry friends of murder victim was an improper promise that rendered suspect's statement involuntary); *Stokes v. State,* 289 Md. 155, 157, 423 A.2d 552 (1980)(holding that interrogating officer's statement that he would not arrest suspect's wife was an improper promise that rendered suspect's statement involuntary); *Hillard, supra,* 286 Md. at 153, 406 A.2d 415 (holding that interrogating officer's statement to the suspect that if he was telling the truth, the officer would "go to bat for" him with the prosecutor was an improper promise that rendered the suspect's statement involuntary); *Streams v. State,* 238 Md. 278, 281, 208 A.2d 614 (1965)(holding that statement by interrogating officer that if suspect made a statement "they would try to get [him] put on probation" was an improper promise that rendered the suspect's statement involuntary).

him, or the weight of the evidence against him, during interrogation, is not a practice that is necessarily so highly psychologically coercive as to deem involuntary any resulting inculpatory statement. The totality of the circumstances standard applies to whether a confession resulting from the deception was voluntarily made. The use of police-fabricated writings is one factor to be considered in the totality of the circumstances in deciding whether the suspect's will was overborne, or whether his statement was the product of a free decision to speak. In assessing the coercive effect *vel non* of a ruse carried out by use of a police-fabricated document, as one factor in the total circumstances, the following may be relevant: the type of document, including whether it has been made to appear authentic or official; the identity of the supposed author of the document; the substance and nature of the information imparted in the document; the manner in which the document was presented to the suspect; and the truth or falsity of the information imparted in the document.

 We now return to the facts in the case at bar, as credited by the hearing court, to assess whether, given the total circumstances surrounding the appellant's interrogation and statements, including that the police showed him fabricated witness statements to misrepresent the evidence against him to trick him into confessing, the appellant's statements were made voluntarily.

The photographs presented to the appellant were genuine, but the handwritten statements on their reverse sides were fabricated. The statements ostensibly were written by the witnesses (Peterson and Ulrich) and were meant to look as such. The fabrications thus were of handwritten statements, not of official, scientific, or government documents. They did not create an appearance of authority and reliability as would, for example, DNA tests presented on the stationery of a police crime laboratory. As mentioned above, the statement designed to look like it had been written by Ulrich was an amateurish fakery (which prompted the hearing judge to ask Francis whether the writing really was his, after Francis had

said it was). The "unsigned" statement on the reverse of the photograph of Geralene was in the same handwriting. The appellant claimed not to have been shown that photograph or statement at all.

The information imparted in the fabricated "statements" was for the most part true, in that it represented information learned by the police in the course of their "Cold Case Unit" investigation. The information on the back of the photograph of Ulrich, for example, was information the police had learned by interviewing Peterson. Although Ulrich had not confessed to killing Lincoln, Sr., Peterson had told the police that the appellant had told her that Ulrich had done so. The ruse was to inflate the strength of the evidence by making the appellant think not only that Peterson had implicated him and Ulrich, but also that she had committed her accusation to writing; and that Ulrich had turned on him and Geralene and also had committed his account to writing. While underhanded, we cannot say that this trick would have dominated the appellant's will so he could no longer freely decide what to say.

Significantly, as in *Whittington,* the appellant did not immediately confess after being presented with the officer's ruse. The appellant continued to deny knowledge of the murder after Francis showed him the photographs and statements. Indeed, he did not display any change of demeanor when the false statements were presented to him. It was not until the appellant heard excerpts from his mother's tape-recorded statement and was told by Francis that she had implicated him in his father's murder that he revealed that he had been present when Ulrich killed Lincoln, Sr.

Other than the use of police-fabricated statements, there was nothing out of the ordinary and certainly nothing coercive about the circumstances surrounding the interrogation. The appellant was 26 years old and a high school graduate. He had been advised of his *Miranda* rights, initialed each of the rights on the "Explanation of Rights" form, and signed his name stating that he understood all his rights. Further, during his taped statement, the appellant said he was speak-

ing freely and voluntarily and had not been made any promises or coerced. The appellant was not under the influence of any substance. No threats or promises were made. The appellant was not denied use of the bathroom or food or drink or medicine. The appellant was not a newcomer to the criminal justice system. The entire interview lasted only an hour and a half. It was conducted in the middle of the afternoon. Only two officers were present.

Upon our independent review, under the totality of the circumstances test of the voluntariness of the appellant's inculpatory statements, we conclude that the use of the police-fabricated "statements" against him did not overcome his will. Accordingly, the hearing court did not err in denying the appellant's motion to suppress the statements from evidence.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.**