912 A.2d 720

Ivan Lorenzo ROLLINS

v.

STATE of Maryland.

No. 1804, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Dec. 13, 2006.

58

Brian L. Zavin (Nancy S. FOrster, Public Defender, on brief), for appellant.

Michelle W. Cole (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel MURPHY, C.J., MEREDITH, RODOWSKY, LAWRENCE F., (Retired, specially assigned), JJ.

MURPHY, C.J.

In the Circuit Court for Prince George's County, a jury (Hon. Michele D. Hotten, presiding) convicted Ivan Lorenzo Rollins, appellant, of first degree murder. The State's evidence, which included appellant's confession, was sufficient to establish that appellant committed this offense on December 26, 2003. Appellant argues, however, that there are four reasons why he is entitled to a new trial:

 I. THE TRIAL COURT ERRED IN DENYING MR. ROLLINS' MOTION TO SUPPRESS STATEMENTS MADE DURING CUSTODIAL INTERROGATION.

 II. THE TRIAL COURT ERRED IN ADMITTING TESTIMONY BY MR. ROLLINS FROM AN UNRELATED CASE TAKEN IN VIOLATION OF HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION AND HIS SIXTH AMENDMENT RIGHT TO COUNSEL.

III. THE TRIAL COURT ERRED IN PERMITTING THE STATE TO INTRODUCE IRRELEVANT AND PREJUDICIAL EVIDENCE OF PRIOR BAD ACTS IN ITS CASE–IN–CHIEF, DURING CROSS–EXAMINATION OF APPELLANT, AND ON RE-BUTTAL.

IV. THE COURT ERRED WHEN IT PERMITTED THE STATE, OVER OBJECTION, TO MISCHAR-ACTERIZE DEFENSE COUNSEL'S CLOSING ARGUMENT.

For the reasons that follow, we hold that there is no merit in any of these arguments, and we shall therefore affirm the judgment of the circuit court.

## Factual Background

About 4:00 p.m. on December 26, 2003, while Corporal Styles Hodge of the Prince George's County Police Department was responding to a "trouble" call at an apartment complex in Landover, he was "flagged down" by appellant, who was crying. Corporal Hodge observed that one of appellant's hands was bleeding. Appellant led Corporal Hodge to apartment 202, where he observed the victim lying face down in a pool of blood. At this point, appellant stated that he had "discovered her" in that condition. Appellant also stated to Corporal Hodge that, as he approached the victim's apartment, he "heard her screaming," and when he entered the apartment he encountered "a guy in a ski mask" who "fled out the front door."

Appellant was transported to the Criminal Investigative Division, where he ultimately told Detective Meredith Bingley that he killed the victim when she came at him with a knife. According to Detective Bingley, appellant stated:

We were arguing. She's never nice to me. She's always mean. She doesn't treat me well. We're arguing and she takes the knife and comes at me and I grab the knife and defending myself, I stabbed her 21 times.

Dr. Susan Hogan, the assistant State Medical Examiner who performed an autopsy on the victim, testified that twelve "stab wounds" and eight "cutting wounds" were discovered on the victim's body. The State's case-in-chief included character witnesses who testified that the victim had a good character for the character traits of peace and good order.

Appellant testified that the statements he made to Corporal Hodge were true, and that the first statements he made to the Criminal Investigative Division detectives (which were consistent with what he had said to Corporal Hodge) were also true. According to appellant, his subsequent false inculpatory statements were made because he was afraid of what the officers might do to him.

The State's case in rebuttal included evidence that (1) appellant carried a knife in his car, (2) in the summer of 2003, appellant left threatening phone messages on the victim's answering machine, and (3) in the summer of 2003, the victim used her next door neighbor's phone to place a "911 call," and told her neighbor that "her boyfriend was harassing her and she wanted to call the police." On this occasion, the neighbor saw appellant "standing in the middle of the street hollering for her to come out, that he wanted to talk to her."

## I.

The circuit court denied appellant's motions to suppress his inculpatory statements in an on-the-record opinion that included the following findings and conclusions:

For purposes of the suppression hearing, the Court is dealing with:

(1) Two oral statements made by the defendant on December 26, 2003 on the scene, one to Officer Hodge, one to Officer Johnson;

(2) Two oral statements made by the defendant to Detective Bingley, same date prior to the CD equipment being turned on. That is, in part, reflected by Defense Exhibit 3 which would have been notes or copies of notes taken by

Detective Bingley concerning her interview of the defendant.

(3) an oral statement made to Detective Bingley by the defendant once the equipment was activated.

(4) a written statement which is in two parts: one, State's Exhibit 3, pages 1 through 4. The second, pages 5 through 8 or, depending upon your point of view, which is reflected in State's Exhibit 5.

Any and all statements will be addressed for purposes of their constitutional dimensions, including the component of Miranda.

(5) the warrantless search and seizure of the defendant's person, which is recorded on the CD.

At the status hearing, both sides agreed to allow the Court to review the almost four-and-a-half hours of the CD which addresses or concerns a sizeable portion of the defendant's interview by Detective Bingley on December 26, 2003[and] on December 27, 2003, which the Court reviewed at length prior to the proceedings. There were several exhibits admitted into evidence and the Court, for purposes of discussion, is going to go through them.

\*      \*      \*

There are two federal constitutional laws governing the defendant's statement or statements procured either during the course of custodial interrogation by the police or other state agents. The Fifth Amendment to the U.S. Constitution essentially provides in part that no person shall be compelled in any criminal case to be a witness against himself. In other words, compelled self-incrimination is prohibited.

The Sixth Amendment provides in pertinent part in all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for his defense. In other words, the right to assistance of counsel.

Overlapping the two is the 14th Amendment due process clause which is applicable to the states. It essentially

provides, "nor shall any state deprive any person of life, liberty, or property without due process of law."

The state corollar[ies] are contained in the Maryland common law and in Article 21 of the Maryland Declaration of Rights, that is the right to counsel, Article 22 of the Maryland Declaration of Rights, guarantee against self-incrimination, and Article 24 which is the due process entitlement.

There must also be, in addition to satisfaction of all of those conformance with Miranda which is triggered by custodial interrogation and requires the appropriate warnings being given and appropriately waived. The State must establish by a preponderance of the evidence that the statements procured were procured within the dictates of all appropriate federal, state law, common law and the dictates of Miranda. The statements are admissible if freely and voluntarily made.

Voluntariness is determined under the totality of the circumstances standard based on a consideration of several factors, including the length of the interrogation, the manner in which the interrogation was conducted, including the methods employed during the course of the interrogation, the mental and physical condition of the defendant, the age, background, education, experience and intelligence of the defendant, whether and when the defendant was taken before a commissioner following his arrest. No single factor makes the statements, per se, voluntary or involuntary.

Officer Hodge testified that he arrived at 2366 Vermont Street, Apartment 202 in Landover, Prince George's County, Maryland, in response to an unknown trouble call. That the defendant flagged him down, was crying and told him something was wrong with his girlfriend.

When the officer went to the apartment accompanied by the defendant, he observed a female on the floor in the bedroom lying in blood. Initially, the defendant orally advised the officer that they went to a job interview in the morning, that he hadn't seen his girlfriend again until he went to check on her later at the apartment. Then the

defendant orally indicated to the officer that he heard his girlfriend scream when he went to check on her at the apartment, saw a guy in a ski mask fleeing the apartment, and that when he got inside he saw her fall to the ground. Officer Hodge noted that the defendant had cut on his hand or finger and that he was treated by paramedics on the scene.

Officer Hodge had Officer Johnson take the defendant to CID for questioning as a witness. At this point, the Court finds that the defendant was, in fact, a witness and not a suspect based on the weighing of the credibility of the witnesses and the evidence presented against the totality of the circumstances.

There is nothing that has been presented by virtue of Officer Hodge's or Officer Johnson's conduct or demeanor which indicated that the defendant was anything other than a witness to a crime at that point.

The defendant was never handcuffed. No weapon was displayed or otherwise employed in his presence. There was nothing that has been gleaned by the evidence presented that the officers in any way attempted to force or otherwise coerce the defendant to speak to them. He was taken to CID in the front passenger seat of Officer Johnson's vehicle, had no handcuffs or other restraints other than presumably a seatbelt. There was no verbal communication which would lead the Court to conclude that the defendant was restrained, in custody, threatened, coerced, promised anything or offered anything to secure the first two oral statements to those particular officers.

Officer Johnson, who testified that he arrived to back up Officer Hodge, confirmed that the defendant was treated by the medical unit on the scene, testified that he, in fact, transported the defendant to CID, confirmed that he was seated in the front passenger seat unrestrained, not handcuffed, that the defendant agreed to accompany him to CID for questioning as a witness, that the defendant made an oral statement to him, as well; in substance, that he came by the apartment to check on his girlfriend. As he ap-

proached, he saw a black male run from her apartment. That he saw his girlfriend fall to the ground and she appeared to be cut.

The defendant is seen by Detective Bingley about 4:48 p.m. at CID. Detective Bingley testified that she was asked to interview the defendant as a witness to a crime, and she agreed. She was not the lead detective in this case. Detective Alexander was the lead investigator.

Based upon the evidence and testimony, it appears that she interviewed the defendant initially until about 6 p.m. He orally related essentially the same variation of the oral statements he made to Officers Hodge and Johnson, including the rendition that someone in a ski mask was the suspect. She exited the room several times during the course of the evening.

The Court finds generally that the officer who entered and exited the room several times did not lock the door at any time. It is clear by the Court that she did open and close the door as she entered and exited, but the Court does not find, in weighing the evidence and the credibility of the witnesses, that she ever locked the door.

It is clear from the evidence and testimony at no time was the defendant handcuffed in the interview room. It is clear that the room is small and has no windows. The Court does not find that there is any evidence that the defendant was intentionally placed in this room or that this room was particularly manufactured for the purpose of procuring statements from this particular defendant.

There was evidence that there were handcuffs that may have been on the wall. At no time were they alluded to by anyone, either police or a state agent. At no time were they alluded to by any of them during the course of the interview of the defendant. Likewise, there is no evidence or testimony to suggest that any weapon or display of force was presented to the defendant to either force him, threaten him or otherwise intimidate him into giving a statement.

When Detective Bingley exited the room about 6 p.m. the first time she spoke to the defendant, she testified that she made a call to Detective Alexander who was on the scene of the crime or at the scene of the crime to get some information presumably to determine whether there were other questions that she needed to ask this particular witness or presumably, being a good law enforcement officer, to determine whether there were any inconsistencies that she needed to clear up.

Based on some of the information provided, the detective returned to the room and confronted the defendant with some of the inconsistencies. The confrontation—and I use that not to indicate that the Court believes that the defendant was intimidated in any way. That she presented the defendant some inconsistences in the oral statement that he had related to her.

During the course of his response to her inquiry, the defendant indicated that the deceased had attacked him first and that's how he got cut. The court finds that at this point the defendant has become a suspect and not a witness. This was the point when Detective Bingley committed the room to turn on the equipment. The Court finds that weighing the evidence and the credibility of the witnesses that she believed at this point that he was a suspect.

She returns to advise the defendant of his Miranda rights. The Court finds that she appropriately advised him of his Miranda rights. That he appropriately waived those rights. That there was nothing by virtue of the Court's review of the evidence and the testimony to suggest that there was anything wrong with the defendant physically or mentally which would have alerted her to an issue.

The defendant indicated that he had received a high school diploma, he had apparently—and that is upon the Court's review of both the CD and the written statements—that he had no problem expressing himself in the English language, that he had no problem expressing himself in a cohesive, coherent fashion and that he was not under the influence of any alcohol, medication, or drugs.

The defendant waived his rights under Miranda, and it is then that the detective or around that time that she decides not to go into questioning or interrogation but to get the defendant something to eat so that he could have something in his stomach. She indicated that she was pregnant at the time. She wanted to have something in her stomach and also to allow the defendant to complete his meal.

The CD indicates that there are several instances where she checks in on him to see if he has completed his meal. During those instances, he appears very eager to stop and talk, but she decides not to allow that to happen until he has completed his meal.

Once she returns to the room and he has completed his meal, they have an oral conversation and then she wants him to reduce his statements to writing.

There is a lot of down time on the CD in terms of the detective's comings and goings and times during which the defendant is reducing what he has indicated to her in writing.

The defendant—the Court's review of the CD indicates that the defendant has no problem writing, that he appears to be reflective during the course of his writing, at least in terms of the narrative portion. There are times when he sits back to reflect and to review what he has read and during those periods of time does not appear to be under the influence of any alcohol, medication, or drugs. There appears to be no one who enters the room to interrupt his flow of thought during the time that he is reducing his statement to writing.

Throughout the over four hours reflected on the CD, the Court finds that the defendant was very cooperative, had an excellent rapport with Detective Bingley, felt very comfortable communicating with her and appeared to be very eager to communicate his thoughts to her. That the detective appeared to respect him and to listen to him during the course of this interview. And even during the down times of the CD, he appears to be in good physical and mental health.

At no time during the course of the CD or any evidence that has been presented does the defendant mention that he had difficulty with his wound on his finger. He does not appear to have that difficulty while he is writing or otherwise communicating with the detective.

There are times during the course of the CD when the defendant appeared bored and tired. During those times he often sits back. Sometimes he puts his head down to rest on the desk; however, when the detectives enter the room, either Detective Bingley or Detective Alexander, he appears to be quite lucid and animated when communicating with them.

The Court finds, based on weighing the credibility of the witnesses and the evidence presented, that there were no promises, offers, threats or inducements of any kind made in order to procure any of the defendant's statements. That is, his statements were not the product of any promise, offer, inducement or threat of any kind as the Court understands the appropriate constitutional dimensions or factors that it must consider.

Detective Alexander, who also testified, indicated that he was present when the defendant consented to the appropriate searches of his person or residence or vehicle. That he was the one who turned off the CD equipment and took the defendant first to the ER room of Prince George's Hospital for treatment regarding the finger, based on his understanding that the County Detention Center would not take a prisoner without prior medical clearance. The court finds nothing odd or inconsistent about that at all.

The Court recognizes that the defendant was initially presented officially to the Commissioner about 3:23 a.m. on December 27, 2003. The Court finds no problem with the time period after midnight—between after midnight and 3:23 a.m. because it is clear that the emergency room stay take [sic] some time and the Court has already related what the medical records reflect once treatment was received.

The swabbing of the defendant's mouth, hands and the taking of his clothing was observed on the tape. They're

clearly warrantless searches and seizures, however. An exception to the warrant requirement is valid consent by the defendant. The consent must be free and voluntary under the totality of the circumstances. The Court finds that the defendant freely and voluntarily provided his consent to the detectives for this purpose.

The Court notes that four witnesses testified in the course of the suppression hearing. The defendant did not testify. The Court has nothing to go on by way of his state of mind or his reaction to anything that went on during the course of the day into the early morning hours other than what has been presented by the evidence and testimony, and that is what the Court must base its decision on.

Weighing the credibility of the witnesses and the evidence presented, the Court finds that the two oral statements made to Officers Hodge and Johnson were not the product of any custody. As such, Miranda is not applicable.

... [T]he oral statement made to Detective Bingley was not the product of custodial interrogation because at that point the defendant was not a suspect but a witness. And it was until the time that he altered his story to indicate that the deceased had attacked him that he was a witness. Once that was related, that changed his status, in the Court's mind, to a suspect status.

It was then that Detective Bingley went out, began to turn on the equipment and came in and provided the Miranda rights. The Court finds no problem with the timeliness of those Miranda warnings or that the defendant freely and voluntarily waived them.

(3) that the written statements that were made by the defendant were in accordance with the federal, state common law and Miranda dictates.

(4) that the defendant waived his right to challenge the warrantless search and seizure by his appropriate valid consent.

(5) that under the totality of the circumstances presented, that the defendant was promptly presented before the com-

missioner in accordance with all constitutional dictates. As such, the defendant's motion to suppress is denied.

Appellant concedes that he was "still being treated as a witness" until after he gave his first written statement. In the words of appellant's brief:

All of that changed, however, when Detective Bingley returned to confront [appellant] with the alleged "inconsistencies" in his prior statements. The police made up facts solely for the purpose of getting [appellant] to incriminate himself, and they did so under circumstances in which a reasonable person would not have felt free to terminate the interrogation and leave. Nevertheless, [appellant] was not advised of his *Miranda* rights until *after* he gave another statement in which he admitted to killing [the victim].

The circuit court rejected this argument. So do we.

In *Lincoln v. State,* 164 Md.App. 170, 882 A.2d 944 (2005), after reviewing the cases in which "this Court has held that confessions were voluntarily obtained notwithstanding the use of deceptive police tactics," Judge Deborah Eyler reaffirmed the proposition that "[t]he totality of the circumstances standard applies to whether a confession resulting from the deception was voluntarily made." *Id.* at 195, 882 A.2d 944. In *Ciriago v. State,* 57 Md.App. 563, 471 A.2d 320 (1984), Judge Moylan stated for this Court:

[I]t is not the mission of the Bill of Rights to protect a fool from his folly. Effective criminal detection depends in large part upon the carelessness and even stupidity of the average criminal. The Constitution does not require continuing legal education seminars for the criminal class in "How More Effectively to Cover One's Tracks."

... [W]e agree with former Chief Judge Joseph Weintraub of New Jersey, as he observed in *State v. McKnight,* 52 N.J. 35, 243 A.2d 240, 250–51 (1968):

"There is no right to escape detection. There is no right to commit a perfect crime or to an equal opportunity to that end. The Constitution is not at all offended when a guilty man stubs his toe. On the contrary, it is decent

to hope that he will. Nor is it dirty business to use evidence a defendant himself may furnish in the detectional stage. Voluntary confessions accord with high moral values, and as to the culprit who reveals his guilt unwittingly with no intent to shed his inner burden, it is *no more unfair to use the evidence he thereby reveals* than it is to turn against him clues at the scene of the crime which a brighter, better informed, or more gifted criminal would not have left. . . . It is consonant with good morals, and the Constitution, to exploit a criminal's ignorance or stupidity in the detectional process."

*Id.* at 576, 471 A.2d 320.

From our independent review of the record,[1] we are persuaded that appellant's inculpatory statements were not obtained as a result of either (1) "the two-step, 'question first,' interrogation strategy" condemned by this Court in *Cooper v. State,* 163 Md.App. 70, 73–74, 877 A.2d 1095 (2005), or (2) any *improper* inducement. Appellant was not entitled to suppression of his inculpatory statements.

## II.

Appellant argues that the State should not have been permitted to cross-examine him about testimony he gave during a hearing on a motion for new trial in an unrelated case. Because that hearing occurred after appellant (1) had been indicted for the murder of the victim in the case at bar, and (2) was represented by counsel, who had filed an entry of appearance but had not yet met with appellant, appellant (in the words of his brief) "urges this Court to adopt the reasoning of those courts which have concluded that, absent a valid waiver, a statement obtained in violation of the Sixth Amendment right to counsel may not be used for impeachment purposes."

---

1. The well settled standard of review was recently discussed in *Perez v. State,* 168 Md.App. 248, 277, 896 A.2d 380 (2006).

Appellant was called to testify that he witnessed a murder allegedly committed by one Saturio G. Fields, and that Mr. Fields was not the person who committed this murder. Before he did so, (1) Mr. Fields' counsel requested that the judge presiding at the hearing prohibit the prosecutor from asking appellant "any questions" about his pending case, and (2) the judge made it clear to appellant that anything he said "could possibly be used against you in the criminal case that you're facing." During the Fields' hearing, appellant testified on cross-examination that he did not "remember talking to the police" on December 26, 2003, because his "mind was blank," and that "[t]he only thing that I remember is going to the hospital." Those statements were inconsistent with appellant's direct examination testimony in the case at bar, in which he (1) insisted that his exculpatory statements were true, and (2) explained why his inculpatory statements were false.

We recognize "that a government agent violates a defendant's Sixth Amendment right to counsel if he or she deliberately elicits incriminating information." *Baker v. State,* 157 Md.App. 600, 628, 853 A.2d 796 (2004). It is obvious that the defendant who testifies in an unrelated case does not thereby submit to a discovery deposition. It is also obvious that the defendant's unrelated case testimony does not "open the door" to cross-examination questions that are of consequence only to the defendant's upcoming case, and have nothing to do with the direct examination testimony. If, however, a criminal defendant who is awaiting trial and represented by counsel elects to testify on behalf of another criminal defendant in an unrelated case, the State may cross-examine the defendant about his or her unrelated case testimony, as long as the record shows that (1) the judge presiding in the unrelated case had advised the defendant of the possibility that the State may be able to use the defendant's testimony during the defendant's trial, and (2) the unrelated case testimony was given by the defendant either on (a) direct examination, or (b) cross-examination that was, pursuant to Md. Rule 5–611(a), "limited to the subject matter of the direct

examination and matters affecting the credibility of the witness."

In the case at bar, the record shows that (1) appellant was advised by the judge presiding at Mr. Fields' motion hearing that anything appellant said "could possibly be used against you in the criminal case that you're facing," and (2) the State's cross-examination of appellant, about falsely claiming to be a witness to a murder that he later admitted committing, was obviously relevant to appellant's credibility, and expressly permitted by Md. Rule 5–608(b). We therefore hold that the State was entitled to cross-examine appellant about the testimony he gave during the hearing on Mr. Fields' motion for a new trial.

## III.

According to appellant, he was unfairly prejudiced by "other bad act" evidence, some of which was included in his statements to the detectives, and some of which was received during the State's case-in-rebuttal. In particular, appellant complains about rebuttal evidence that (1) the victim once had him "locked up," on charges that were later *nol prossed,* (2) he carried a knife in his car, and (3) he had made "prior threats" against the victim. Appellant argues (in the words of his brief):

> [Appellant] did in fact choose to testify on his own behalf. The vast majority of defense counsel's direct examination focused on [appellant's] account of the events surrounding [the victim's] death. Although [appellant] stated that he did not threaten [the victim] with a knife or try to kill her on December 26, 2003, he was not asked about their relationship in general. Likewise, defense counsel did not ask [appellant] whether he had ever harassed [the victim] or left threatening messages on her answering machine. Nevertheless, the prosecutor broached those subjects on cross-examination[.]

Under Maryland's "scope of cross-examination" cases, which are entirely consistent with the "subject matter" limita-

tion set forth in Md. Rule 5–611(a), "the cross-examination of [a] witness [is not restricted] to the specific details inquired into on direct examination, but permits full inquiry into the subject matter entered into. Where a general subject has been entered upon in the examination in chief, the cross-examining counsel may ask any relevant question on the general subject." *Williams v. Graff*, 194 Md. 516, 522, 71 A.2d 450 (1950).

The record shows that the circuit court understood the requirement that "for other crimes evidence to be admissible, it must pass a three-step test." *Skrivanek v. State*, 356 Md. 270, 291, 739 A.2d 12 (1999). In fact, after subjecting the evidence at issue to an on-the-record analysis, which included a discussion of Md. Rule 5–404(b), the circuit court prohibited the State from introducing the rebuttal evidence during the State's case-in-chief. Appellant's direct examination testimony, however, created the logical inference that he and the victim had a good relationship. Under these circumstances, the State was entitled to present evidence that rebutted, i.e. contradicted the inference that appellant and the victim had a "good relationship." We therefore hold that the circuit court did not err or abuse its discretion in concluding that the State was entitled to (1) cross-examine appellant about the details at issue, and (2) in its case-in-rebuttal, offer rebuttal extrinsic evidence that contradicted appellant's account of his relationship with the victim.

## IV.

The closing argument of appellant's trial counsel included a request that the jury "consider all of the counts in this matter," because appellant's inculpatory statements generated the issues of whether appellant was guilty of manslaughter or second degree murder rather than first degree murder. During the State's rebuttal argument, the circuit court overruled appellant's objection to the prosecutor's statement that appellant's counsel had "said [in his closing argument that he] will not even argue hot blooded response and

second degree, so manslaughter is out." According to appellant, this erroneous ruling entitles him to a new trial.

The jurors were instructed that arguments of counsel are not evidence, and that they were obligated to follow the court's instructions during their deliberations. Moreover, mischaracterization of evidence during closing argument is much more likely so than not so to backfire against the party whose counsel has made the ill advised remark. Under these circumstances, we are persuaded that the comment about which appellant complains in no way "actually misled the jury or [was] likely to have misled or influenced the jury to the prejudice of the accused." *Degren v. State*, 352 Md. 400, 431, 722 A.2d 887 (1999).

**JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.**