[No. C057099. Third Dist. May 8, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
DARIOUS ANTOINE MAYS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I., II., V., VI., VII. and VIII. of the Discussion.

## Counsel

A. M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**SIMS, Acting P. J.**—In this case, defendant Darious Antoine Mays was being questioned about his involvement in a homicide. Defendant asked to take a polygraph test. The police administered a fake polygraph test during which defendant denied any involvement in the crime. The police showed defendant a fake graph from the fake polygraph machine and told defendant he had not been telling the truth. Defendant then admitted he had been present at the scene of the crime. We hold that defendant's admissions were not involuntary so as to preclude their admission in evidence.

Defendant Mays appeals following his conviction of first degree murder with a lying-in-wait special circumstance and personal firearm discharge enhancement. (Pen. Code, §§ 187, 190.2, subd. (a)(15), 12022.53, subds. (b)–(d); undesignated statutory references are to the Penal Code.) Defendant contends the trial court erred by (1) denying his *Batson-Wheeler*[1] motion when the prosecutor used a peremptory challenge on a Black prospective juror, (2) admitting into evidence defendant's statements taken by police in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], (3) admitting into evidence defendant's statements allegedly

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].

coerced by police faking a polygraph test, (4) allowing a witness to testify by conditional examination videotaped outside of the presence of the jury and the public and then played in open court, and (5) denying defendant's motion for new trial. Defendant also challenges a parole revocation fine (§ 1202.45) and a clerical error in the abstract of judgment showing the case as a three strikes case.

In the unpublished portions of the opinion, we explain why we reject defendant's *Batson-Wheeler* and *Miranda* claims and why we shall order modification of the abstract of judgment (1) to strike the parole revocation fine (§ 1202.45) and (2) to delete the reference to the three strikes law. In the published portion of the opinion, we reject defendant's contentions (3) and (4). Thus, although we will modify the abstract of judgment, we will otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A complaint deemed to be an information alleged that on January 24, 2005, defendant committed first degree murder of Sheppard Scott (§ 187), with a special circumstance of lying in wait (§ 190.2, subd. (a)(15)), and an enhancement for personal discharge of a firearm causing death (§ 12022.53, subds. (b)–(d)). Defendant's age (17) precluded the death penalty. (§ 190.5.)

The trial court denied defendant's motion to suppress his statements to police on the ground of a *Miranda* violation, as we discuss, *post*. The jury thus heard evidence that defendant admitted to the police that he was at the crime scene at the time of the crime, though he denied being involved.

Evidence adduced at trial included the following:

Yalandria Narcisse testified she was the victim's girlfriend and was with him when he was shot.[2] Around 4:30 a.m. on January 24, 2005, they were in a car waiting to order food at the Jack in the Box drive-through on Norwood Avenue. Two persons standing outside the adjacent "ampm" store asked if the victim had any weed, and he said no. The victim told Narcisse one of the two persons insulted him, calling him a "bitch-ass nigger or something." She said she did not hear that. The victim got out of the car and engaged in an animated conversation with the two persons, during which the victim stated a gang affiliation. As the victim walked back to the car, Narcisse saw one of the persons, dressed in orange (an Orioles jacket), pass something to the other

---

[2] Narcisse, who was not the victim's only girlfriend, had misdemeanor convictions for prostitution and loitering with intent to commit prostitution. In a hearing on admissibility of her prior convictions for impeachment, she acknowledged the victim was her pimp.

person, who was dressed in a gray hooded sweatshirt. The victim collected the food and drove to the exit. Somebody yelled, "hey, homey," and the victim stopped the car. The gray-clad male came up to the car and said he wanted to apologize. The victim said to forget about it. The person in gray held out his hand to shake. The victim, still seated in the car, held out his hand. The person in gray pulled out a gun, fired several shots at the victim, and ran off (following the person in the orange jacket).[3]

Narcisse (and other witnesses) said the shooter fired the gun with his right hand. Defendant (and others) testified defendant is left handed. Narcisse testified, "The guy in the gray sweater took out his hand, took out his hand to shake, to shake [victim] Sheppard's and then Sheppard stuck out his hand and when the guy pulled out his hand he had a gun and he started shooting." This would only make sense if the shooter had the gun in the hand other than the one he extended to shake hands. Narcisse thought the shooter had gold teeth (defendant does not have and denies ever having worn gold teeth), and from her seated position she thought the shooter stood about five feet one inch tall (defendant is five feet seven inches tall).

Narcisse and the victim had been drinking alcohol that night. The police did not determine the extent of Narcisse's drinking.

An autopsy revealed the victim, who had a blood-alcohol level of 0.11 percent, was shot six times.

Surveillance cameras at ampm did not capture images of the shooting but did capture images of the persons wearing gray and orange and shows one of them pointing at the victim's vehicle as it passes through the ampm parking lot on its way to Jack in the Box. The images of the suspects are not clear.

Witness Sharla Flores was across the street, heard the shots, looked and saw the male in the gray sweatshirt, whom she had encountered earlier that night, firing a gun at a car. When shown a photo lineup, she indicated defendant's photo could possibly be the shooter. She rated her level of certainty as five out of 10. When shown the ampm photo, she said it looked like the shooter (four on a scale of 10) but she could not tell because she could not make out the face in the photo. She believed the shooter used his right hand but was not positive.

---

[3] The special circumstance of lying in wait applies if the defendant concealed his purpose from the person killed, waited for an opportunity to act, and made a surprise attack on the person killed from a position of advantage, with intent to kill by taking the person by surprise. (*People v. Morales* (1989) 48 Cal.3d 527, 554–556 [257 Cal.Rptr. 64, 770 P.2d 244]; Judicial Council of Cal. Crim. Jury Instns. (2006–2007) CALCRIM No. 728.) Physical concealment is not necessary. (*Morales, supra*, 48 Cal.3d 527, 554.)

Lisa Faupula, who was pumping gas at the ampm, saw a young Black male rapidly approach a car, pull out a gun, fire multiple shots with his right hand (defendant testified he is left handed), and run off. She estimated his height at five feet seven or eight inches. She "guessed" his weight at 145 or 150 pounds. She said he wore a white "doo-rag" on his head, tied in back with a piece of cloth hanging down, and white trousers. (The pants of the gray-clad male in the ampm photo appear to be white or gray.) She admitted her eyesight was not good and she was in shock. She was unsure whether the gray-clad person in the ampm photo was the shooter and could not identify anyone.

Edward Kim was pumping gas. He noticed a male wearing an orange jacket walk past him. Kim returned his attention to his task, then heard gunshots, turned, and saw two persons running away—the male in the orange jacket, and another male wearing dark clothing.

The prosecution sought (over defense objection) to conduct a conditional examination of Tamara Schallenberg, a neighbor who considers defendant like a son, on the ground she had phobias precluding testimony in open court. A psychiatry resident who treated her testified Schallenberg has a panic disorder with agoraphobia, characterized by sudden onset of shortness of breath, chest pain, dizziness, and extreme fear. Schallenberg has reported passing out when a panic attack brought on an asthma attack. The doctor did not believe Schallenberg was faking. The doctor said Schallenberg might be able to testify if she took a sedative, but the risk was oversedation. The court allowed a conditional examination of Schallenberg in a courtroom, in the presence of the judge, court staff, counsel for both sides, and defendant; the jury and the public were excluded. The conditional examination was video-taped. The court found the witness's infirmity made her unavailable to testify in open court. The videotaped conditional examination was played for the jury in open court.

In her conditional examination, Schallenberg denied making statements to the police, including identification of defendant and his brother as the persons depicted in the ampm photos. She testified that she told the officer the person in the photo might be defendant, but she was not sure. She testified she never saw defendant wear a light gray sweatshirt. She denied ever seeing defendant deal drugs and denied that he ever said he was a gang member. Schallenberg testified she has known defendant since 1999, and he is like a son to her. She admitted that one day in January 2005, she received a phone call from defendant's mother around 5:00 a.m. As a result of the call, Schallenberg went out looking for defendant, but she did not find him. The next day, she saw defendant and asked him what was going on. Defendant said he was with his brother at the ampm, and his brother shot somebody. In her conditional

examination, Schallenberg said defendant laughed when he told her, but it was a "scared" laugh. Schallenberg also admitted that she and defendant had a telephone conversation while he was in jail, in which he said the investigator said she should testify in court that she made false statements to the police because she was mad at defendant.

Detective Charles Husted testified about his audiotaped interview of Schallenberg. He showed Schallenberg the ampm photo, and she stated without hesitation that the person in the gray sweatshirt was defendant. Husted asked how she knew, and she said she knew because she knows him. She also recognized his sweatshirt, which he wore all the time, which had "South Pole" written on its back.[4] She also said the person in the orange Orioles hat and jacket was defendant's older brother "Rico" (Deladier Montue). Husted said Schallenberg said defendant laughed like "he thought it was funny" when he told her about his being at the ampm when his brother shot someone. Husted said Schallenberg said defendant said he was a gang member, and she had seen him apparently selling drugs.

When shown a book of mug shots, Narcisse focused on a photograph of someone other than defendant and said he looked like the shooter. After the interview with Schallenberg, the police showed Narcisse a photo lineup. Narcisse focused on photo No. 3 (defendant) and said everything about it looked like the shooter, and she believed it was the shooter.

Flores, the witness who stood across the street, also identified photo No. 3 as "possibly" the shooter, expressing her certainty level as five on a scale of one to 10. At trial, Flores said her certainty level was four that the gray-clad person in the ampm image was the shooter.

Defendant's girlfriend, Judy Perez, testified she never spoke with defendant about the shooting. She denied telling the police that defendant said his brother was involved. After the prosecutor showed Perez portions of her videotaped conversation with police, she admitted she told them that defendant said his brother was involved (though she did not remember telling them that).

Detective Husted testified he questioned defendant, who initially denied any involvement, denied being present at the shooting, and denied being the gray-clad person in the ampm photo. Defendant said the police had no murder weapon. When asked how he knew that, defendant said it was

---

[4] No lettering is apparent on the sweatshirt in the ampm photos. A gray, hooded sweatshirt bearing the lettering "South Pole" was seized when defendant was arrested. However, the People acknowledge defendant's South Pole sweatshirt is not the sweatshirt depicted in the ampm photos.

common sense, and they would have locked him up if they had a weapon, and his brother said the police went to his home looking for the weapon. Defendant denied telling Schallenberg about a shooting at the ampm.

Defendant repeatedly asked the detective for a lie detector test. Because no polygraph examiner was available, the detective's supervisor authorized a mock polygraph test, i.e., the police placed on his body patches connected to wires, pretended to administer a lie detector test, fabricated written test results, showed defendant the fake results, and told him the results showed he failed the test. The detective suggested that perhaps defendant failed because he was present during the crime and felt some guilt about that. Defendant then admitted he was present at the shooting, and he was the person wearing the gray sweatshirt in the ampm photo, but he said he knew nothing about the shooting in advance and did not participate. He said the shooter was the person in orange, whom defendant had just met that day. The day after the shooting, the shooter found defendant and threatened him. Defendant admitted gang membership. Defendant, who cut his hair after the shooting, first said his brother made him cut it, but he did not remember why. Defendant immediately thereafter said he guessed the reason was because his cousin said the victim's brother mistakenly thought defendant was involved and was hunting for him. The videotaped police interview of defendant was played for the jury.

Defendant testified at trial. He is left handed. He denied ever wearing jewelry or gold teeth (as some witnesses described the shooter). He denied shooting Sheppard Scott and denied even being present when Scott was shot. He claimed his inconsistent statements to the police were false admissions given only because he felt defeated after the fake lie detector test, which he did not know was fake, and he just said what the police wanted to hear. Defendant admitted prior trips to juvenile court for fleeing police officers while driving; none of his prior misconduct involved assault with a gun. He admitted selling drugs and being a member of a street gang.

The defense tried to call as a witness Marcos Adams (also known as Marcus Adams), but he invoked his Fifth Amendment right and refused to answer questions.[5]

The jury found defendant guilty of first degree murder and found true the lying-in-wait special circumstance and the firearm enhancement.

[5] A week before trial started, Adams told a defense investigator that he was the person in the orange jacket, the person in the gray sweatshirt was a "hustler" named Jon Jon and not defendant (whom Adams knew through his friendship with defendant's brother), and Adams left the scene before the shooting. As we discuss *post*, Adams was the subject of defendant's motion for new trial.

The trial court denied defendant's motion for new trial. The court sentenced defendant to life in prison without the possibility of parole for the special circumstance murder, plus a consecutive term of 25 years to life for the gun enhancement.

## DISCUSSION

I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. *Mock Polygraph*

Defendant argues his incriminating statements to police were coerced by the police pretending to conduct a polygraph test and fabricating fake documentary graph results.

Assuming for the sake of argument that the issue is not forfeited by defendant's failure to object on this basis in the trial court, a point disputed by the parties, we see no grounds for reversal.

A confession is involuntary if it is the result of coercive police activity. (*People v. Williams* (1997) 16 Cal.4th 635, 659 [66 Cal.Rptr.2d 573, 941 P.2d 752].) The question is whether defendant's will was overborne. (*People v. Boyette* (2002) 29 Cal.4th 381, 411 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

Police deception during a custodial interrogation may but does not necessarily invalidate incriminating statements. A psychological ploy is prohibited only when, in light of all the circumstances, it is so coercive that it tends to result in a statement that is both involuntary and unreliable. (*Illinois v. Perkins* (1990) 496 U.S. 292, 297 [110 L.Ed.2d 243, 110 S.Ct. 2394] [undercover law enforcement officer posing as fellow inmate was not required to give *Miranda* warnings to suspect]; *People v. Maury* (2003) 30 Cal.4th 342, 411 [133 Cal.Rptr.2d 561, 68 P.3d 1].) We apply de novo review to the undisputed facts. (*People v. Farnam* (2002) 28 Cal.4th 107, 181 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

As summarized in *People v. Chutan* (1999) 72 Cal.App.4th 1276 [85 Cal.Rptr.2d 744]:

"Police trickery that occurs in the process of a criminal interrogation does not, by itself, render a confession involuntary and violate the state or

*See footnote, *ante*, page 156.

federal due process clause. [Citation.] Why? Because subterfuge is not necessarily coercive in nature. [Citation.] And unless the police engage in conduct which coerces a suspect into confessing, no finding of involuntariness can be made. [Citations.]

"So long as a police officer's misrepresentations or omissions are not of a kind likely to produce a *false* confession, confessions prompted by deception are admissible in evidence. [Citations.] Police officers are thus at liberty to utilize deceptive stratagems to trick a guilty person into confessing. The cases from California and federal courts validating such tactics are legion. (See, e.g., *Frazier* v. *Cupp* (1969) 394 U.S. 731, 739 [22 L.Ed.2d 684, 693, 89 S.Ct. 1420] [officer falsely told the suspect his accomplice had been captured and confessed]; *People* v. *Jones* [(1998)] 17 Cal.4th [279,] 299 [70 Cal.Rptr.2d 793, 949 P.2d 890] [officer implied he could prove more than he actually could]; *People* v. *Thompson* [(1990)] 50 Cal.3d [134,] 167 [266 Cal.Rptr. 309, 785 P.2d 857] [officers repeatedly lied, insisting they had evidence linking the suspect to a homicide]; *In re Walker* (1974) 10 Cal.3d 764, 777 [112 Cal.Rptr. 177, 518 P.2d 1129] [wounded suspect told he might die before he reached the hospital, so he should talk while he still had the chance]; *People* v. *Parrison* [(1982)] 137 Cal.App.3d [529,] 537 [187 Cal.Rptr. 123] [police falsely told suspect a gun residue test produced a positive result]; *People* v. *Watkins* (1970) 6 Cal.App.3d 119, 124–125 [85 Cal.Rptr. 621] [officer told suspect his fingerprints had been found on the getaway car, although no prints had been obtained]; and *Amaya-Ruiz* v. *Stewart* (9th Cir. 1997) 121 F.3d 486, 495 [suspect falsely told he had been identified by an eyewitness].)" (*Chutan, supra,* 72 Cal.App.4th at pp. 1280–1281 [defendant's confession to child molestation was not rendered involuntary by officer's failure to reveal he was conducting a criminal investigation and not just asking questions regarding placement of the children]; see generally Annot., Admissibility of confession as affected by its inducement through artifice, deception, trickery, or fraud (1965) 99 A.L.R.2d 772; Magid, *Deceptive Police Interrogation Practices: How Far Is Too Far?* (2001) 99 Mich. L.Rev. 1168.)

*People v. Smith* (2007) 40 Cal.4th 483 [54 Cal.Rptr.3d 245, 150 P.3d 1224] held it was not impermissibly coercive for a police officer to tell the defendant that a " 'Neutron Proton Negligence Intelligence Test' " (a sham) indicated he had recently fired a gun. (*Id.* at pp. 505–506.) Additionally, the sham did not elicit a full confession, but only incriminating statements.

*People v. Farnam, supra,* 28 Cal.4th 107, held the defendant's confession to robbery and assault of hotel occupants was voluntary, despite the police having falsely informed the defendant that his fingerprints were found on the victim's wallet. (*Id.* at pp. 130, 182.)

■ In California, it has been held that if a defendant takes a lie detector test willingly, " 'neither the fact it was given nor the fact that the defendant was told by the test giver it revealed in his opinion that defendant was not telling the truth, inherently demonstrates coercion. [Citation.]' " (*People v. Brown* (1981) 119 Cal.App.3d 116, 127 [173 Cal.Rptr. 877].)

Courts in other states have held defendants' confessions/admissions voluntary where the police told the defendant he or she failed a polygraph test, when no real test was performed, or a real test was given but did not show deception by the defendant, or the police misled the defendant as to the accuracy of the test or its admissibility in court. (E.g., *People v. Serrano* (N.Y.App.Div. 2005) 14 A.D.3d 874 [788 N.Y.S.2d 272] [confession voluntary despite police (apparent) deception in informing the defendant that he failed a polygraph examination]; *People v. Sobchik* (N.Y.App.Div. 1996) 228 A.D.2d 800 [644 N.Y.S.2d 370] [confession voluntary where defendant was hooked up to a polygraph, but it was not turned on]; *Contee v. U.S.* (D.C. 1995) 667 A.2d 103, 104 [affirmed conviction based on confession obtained after the police (perhaps) untruthfully told the 17-year-old defendant that he failed a computer voice stress analyzer, when in fact the test did not so indicate, or did so unreliably]; *State v. Farley* (1994) 192 W.Va. 247 [452 S.E.2d 50] [police misrepresentations to defendant concerning performance on polygraph test did not invalidate confession].)

Here, we disagree with defendant's view that the police engaged in shocking and outrageous misconduct. The request for a polygraph examination was initiated by defendant, not by the police. The deception was a mock polygraph. A polygraph is designed to elicit the truth, and the police already had information from other sources that defendant was the shooter (including Schallenberg's identification of defendant as the gray-clad person in the ampm photo, and eyewitness statements that the gray-clad person was the shooter). The use of the mock polygraph was not likely to produce a false confession. Although defendant testified he believed polygraphs are 100 percent accurate, that belief was not induced by the police. Moreover, we know the trickery was not particularly coercive because, even after the police showed defendant the fake test results, defendant continued to deny involvement in the crime. He merely admitted being present at the scene wearing a gray sweatshirt. It was other evidence, other than defendant's statements, which gave his admission its weight, i.e., the ampm surveillance photo of a gray-clad male, Schallenberg's identification of defendant as the gray-clad male in the photo, and the testimony of eyewitnesses that the gray-clad male was the shooter. (Although the prosecutor used defendant's admissions in closing argument to the jury, he used them as corroboration for the other evidence.)

We thus agree with the People that defendant's ability to admit being present, while steadfastly denying participation, demonstrates that his will was not overborne by the police ruse.

Defendant claims coercion is established by the police showing him a fake graph (from the fake polygraph) as "supposedly constituting irrefutable scientific proof" that he lied. Having viewed the video and transcript of this exchange, we disagree with defendant's characterization. The police made no representations about scientific accuracy, and the officer posing as a polygraph examiner merely said the graph "showed deception."

Defendant cites case law from other states holding that police fabrication of *tangible* evidence to cause a defendant to confess is coercive per se (e.g., *State v. Cayward* (Fla. 1989) 552 So.2d 971), or is a factor pointing to coercion under a totality of circumstances test (e.g., *Lincoln v. State* (2005) 164 Md.App. 170 [882 A.2d 944]). First, in our case, defendant did not confess to any criminal involvement, but merely admitted he was at the scene. Second, no one sought to introduce the test graph as evidence of guilt. Third, we are not bound by cases from other states. (*J. C. Penney Casualty Ins. Co. v. M. K.* (1991) 52 Cal.3d 1009, 1027 [278 Cal.Rptr. 64, 804 P.2d 689].) Though we may consider decisions of other states, defendant concedes there is no consensus among the other states, but rather a split as to whether tangible documents are coercive per se or a factor to be considered.

We see no reason to apply a rule that would make the fake graph coercive per se. Defendant's cited authority, *State v. Cayward, supra*, 552 So.2d 971, felt the need for a "bright line" test between verbal and documentary deception, because the Florida court felt a "spontaneous distaste" for the use of fake documents; documents are permanent and facially reliable; and there is a danger their falsity may be forgotten and they may be mistaken for the truth. (*Id.* at pp. 973–974.) We feel confident our courts are capable of deciding voluntariness without a bright line making all documents automatically coercive. While we might view some fake documents as coercive, e.g., a fake search warrant, we see no reason to treat the police misrepresentations differently in this case depending on whether they merely told defendant he failed a polygraph test or told him he failed while showing him a fake graph. Since the graph merely showed squiggly lines with handwritten notations such as "intend to lie" and is useless as evidence without testimony from a certified polygraph examiner, there is no risk of its presence in the record being mistaken for a true polygraph test somewhere down the road.

Considering the tangible graph paper as one of the totality of circumstances, we still conclude defendant's statements were voluntary and not coerced.

Defendant claims the evidence shows his admission about being present at the crime scene was a false admission, because he got some things wrong, i.e., he said the victim's passenger was a male, and he pointed out as the shooting site a location which did not match the location where the expended shells were found. We disagree.

This case is distinguishable from defendant's cited authorities finding confessions involuntary. Thus, *In re Shawn D.* (1993) 20 Cal.App.4th 200 [24 Cal.Rptr.2d 395] said police deception (telling the minor that witnesses could identify him and that his girlfriend would get in trouble if he did not confess, and misrepresenting that he would be tried as an adult and sent to San Quentin), while "not commendable," might not be enough to demonstrate the defendant's will was overborne, but was enough when added to the police's repeated suggestions that the minor would be treated more leniently if he confessed. (*Id.* at pp. 213–214.) *People v. Esqueda* (1993) 17 Cal.App.4th 1450 [22 Cal.Rptr.2d 126] found a confession involuntary where the police, besides falsely claiming to have evidence against the defendant (dying declaration of victim, fingerprints, a witness, etc.) questioned the defendant for eight hours with little, if any, respite; ignored his repeated invocations of the right to remain silent; told him what they wanted him to say and that they would not stop until they got what they wanted; and threatened him that his silence would result in greater charges. (*Id.* at pp. 1485–1486.)

■ We conclude the mock polygraph test and fake test results do not warrant reversal of the judgment. We have no occasion to consider a situation where the police, not the defendant, initiate a demand that defendant take a polygraph.

## IV. *Conditional Examination of Schallenberg*

Defendant argues conditional examinations are statutorily prohibited in cases for which the punishment may be death (§ 1335 et seq.);[7] Schallenberg's condition did not warrant a conditional examination or finding of unavailability

---

[7] Section 1335, subdivision (a), provides, "When a defendant has been charged with a public offense triable in any court, he or she in all cases, and the people in cases other than those for which the punishment may be death, may, if the defendant has been fully informed of his or her right to counsel as provided by law, have witnesses examined conditionally in his or her or their behalf, as prescribed in this chapter."

Section 1336, subdivision (a), says, "When a material witness for the defendant, or for the people, is about to leave the state, or is so sick or infirm as to afford reasonable grounds for apprehension that he or she will be unable to attend the trial, . . . the defendant or the people may apply for an order that the witness be examined conditionally."

to testify at trial (Evid. Code, § 240);[8] and the exclusion of the jurors and the public from the courtroom violated defendant's rights to due process and a public trial. Assuming for the sake of argument that defendant did not forfeit the first point by failing to raise it in the trial court, we see no basis for reversal on any ground.

## A. *Background*

The People moved to conduct a conditional examination of Schallenberg. The trial court held an Evidence Code section 402 hearing, in which a second-year psychiatry resident, Dr. Julie Young, testified Schallenberg has panic disorder and agoraphobia, causing sudden onsets of shortness of breath, chest pain, dizziness, and extreme fear. Her panic attacks can cause asthma attacks and have caused her to pass out in the past. The doctor opined there should be as few people as possible in the room if Schallenberg were to testify. In opposition, defendant put on evidence that Schallenberg had two meetings with the prosecution's investigator at the prosecutor's office, in a windowless room, without suffering a panic attack. She also exhibited no signs of distress or shyness when she was questioned at her home. At one point she fetched what appeared to be an asthma inhaler but did not use it.

Over defense objection that Schallenberg's condition did not warrant a conditional examination, the trial court granted the motion and held a videotaped conditional examination of Schallenberg in a courtroom, in the presence of defendant, counsel, and the judge, and subject to cross-examination by defense counsel, but excluding the jurors and the public from the courtroom.

After the conditional examination, the court found Schallenberg unavailable to testify at trial. The court stated on the record the observations of the court and/or court staff, that Schallenberg was visibly trembling and shaking at various points during the protracted amount of time it took for her to adjust to the room and during the first few minutes of her testimony. (Schallenberg's demeanor while adjusting to the room was not videotaped.) She displayed breathing difficulty and used her inhaler twice, which seemed to help. After a while, she seemed fine and was even "feisty" in her answers. The court said it had intended to do a "supplementary voir dire" with Schallenberg before beginning her testimony, in order to determine whether or not she could testify in front of the jury, but based on the observations of the witness and the doctor's opinion, the court concluded it was not necessary and may have jeopardized getting the conditional examination. The court said the witness's

---

[8] Evidence Code section 240, subdivision (a)(3), describes as unavailable a person "unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity."

ability to give "feisty" answers did not change the ruling because the ruling was based on the court's concern that she would suffer an attack and go into rapid breathing and pass out. Her ability to handle the conditional examination was credited in part to the measures the court had taken, such as keeping to a minimum the number of people in the courtroom.

The videotaped testimony of Schallenberg was played for the jury in open court.

## B. *Analysis*

We first dispose of defendant's argument, made for the first time on appeal, that section 1335 (see fn. 7, *ante*) prohibits conditional examinations in death penalty cases. The People did not seek the death penalty, and could not have done so because section 190.5, subdivision (a), prohibits the death penalty for persons under age 18 at the time of the crime. Defendant nevertheless argues the allegation of lying in wait as a special circumstance made this a death penalty case. We shall consider this legal question despite defendant's failure to raise it in the trial court.

Defendant cites *People v. Jurado* (2006) 38 Cal.4th 72 [41 Cal.Rptr.3d 319, 131 P.3d 400], which construed the statutory scheme as allowing a conditional examination in a death penalty case where the witness's life is in jeopardy. (*Id.* at p. 111.) That holding does not help here.

Defendant cites *People v. Anderson* (2002) 28 Cal.4th 767 [122 Cal.Rptr.2d 587, 50 P.3d 368], which construed section 26, which provides that the defense of duress does not apply to a "crime punishable with death." (28 Cal.4th at pp. 774–780.) *Anderson* held section 26 barred use of the duress defense in any murder case, regardless of whether or not the death penalty was at issue, because section 26 was enacted when all first degree murder was punishable by death, and was a continuation of an 1850 statute, when all murder was punishable by death. (28 Cal.4th at pp. 774–780.) Defendant argues that, by parity of reasoning, the restrictions on conditional examinations apply to all murder cases, because the crime of murder is punishable by death. We disagree and see no parallel between *Anderson* and this case.

More apposite is *People v. Superior Court (Kim)* (1993) 20 Cal.App.4th 936 [25 Cal.Rptr.2d 38], which held the trial court erred in setting bail for a minor in a first degree murder case with a special circumstance allegation. The law provides for bail except for persons charged with a "capital crime" or an " 'offense punishable with death,' " but section 190.5 prohibited imposition of the death penalty on the minor. (20 Cal.App.4th at pp. 938–940.) The appellate court said the test for bail is the gravity of the offense itself, not the individual characteristics of the specific defendant. (*Ibid.*)

Here, defendant offers no analysis whatsoever, and we see no reason, as to why a conditional examination should be barred where the individual defendant is not subject to the death penalty. Even in death penalty cases, witnesses may be found unavailable to testify at trial under Evidence Code section 240, such that prior examinations under oath are admissible. (E.g., *People v. Williams* (2008) 43 Cal.4th 584, 610–611 [75 Cal.Rptr.3d 691, 181 P.3d 1035] [admission of preliminary hearing transcript]; *People v. Smith* (2003) 30 Cal.4th 581, 608–612 [134 Cal.Rptr.2d 1, 68 P.3d 302] [same].) We see no reason to invent a different rule for conditional examinations under section 1335 et seq.[9]

---

[9] In a petition for rehearing, defendant argues that a prosecutor's ability to conduct a conditional examination in a serious felony case is limited to situations where the witness's life is in jeopardy, because section 1335, subdivision (b), states: "When a defendant has been charged with a serious felony, the people . . . may . . . have a witness examined conditionally as prescribed in this chapter, if there is evidence that the life of the witness is in jeopardy."

However, the point is forfeited for failure to raise it in the trial court where the admissibility of the conditional examination was litigated under section 1336, not section 1335. Thus, Evidence Code section 353 provides as pertinent, "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ." "[A] trial objection must fairly state the specific reason or reasons the defendant believes the evidence should be excluded. . . . A defendant may not argue on appeal that the court should have excluded the evidence for a reason *not* asserted at trial." (*People v. Partida* (2005) 37 Cal.4th 428, 431 [35 Cal.Rptr.3d 644, 122 P.3d 765].) Defendant's assertion of a constitutional violation does not excuse the forfeiture. (*People v. Rudd* (1998) 63 Cal.App.4th 620, 628 [73 Cal.Rptr.2d 807] [constitutional objections must be interposed before the trial judge in order to preserve them for appeal].)

Defendant argues there should be no forfeiture where the issue involves a lack of statutory authorization. Here, however, there *was* statutory authorization for the trial court's ruling. Thus, the parties litigated the matter, and the trial court granted the conditional examination, under section 1336 (fn. 7, *ante*), which authorizes a conditional examination when the People's witness is so infirm as to cause apprehension that she will be unable to attend the trial.

Defendant argues alternatively that any forfeiture resulted from ineffective assistance of counsel. To establish ineffective assistance, defendant bears the burden of showing that (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms, and (2) absent counsel's error, it is reasonably probable that the verdict would have been more favorable to defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217 [233 Cal.Rptr. 404, 729 P.2d 839].)

Ordinarily, we do not determine claims of ineffective assistance of counsel without input from trial counsel. "If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212 [65 Cal.Rptr.2d 240, 939 P.2d 354].) Counsel's failure to object to evidence (which was the ultimate purpose of the conditional examination) is a matter of trial tactics. (*People v. Lewis* (2001) 25 Cal.4th 610, 661 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Because we accord great deference to trial counsel's tactical decisions, counsel's failure to object on a given ground rarely provides a basis for finding ineffective assistance. (*Ibid.*) We cannot say there could be no satisfactory explanation for a failure to object on the

We conclude the conditional examination was not statutorily prohibited in this case.

Defendant alternatively argues a conditional examination was not necessary in the circumstances of this case, and the trial court erred in refusing his request to elicit evidence that Schallenberg managed to overcome her disorder in other respects (such as attending interviews at the district attorney's office). Defendant claims the prosecutor failed to comply with procedural requirements for conditional examinations (§ 1337 [affidavits required]), but defendant acknowledges he made no objection on this ground in the trial court. Since any such defect (assuming one existed) could have been cured upon timely defense objection, defendant has forfeited any procedural objection.

■ The trial court has discretion whether to grant a conditional examination. (*People v. Jurado, supra*, 38 Cal.4th at p. 114.) However, the determination whether a witness is unavailable to testify at trial due to mental illness or infirmity that would cause substantial trauma, is a mixed question of law and fact, with factual findings subject to a deferential standard of substantial evidence, and findings of law subject to independent review. (*People v. Winslow* (2004) 123 Cal.App.4th 464, 467, 470–471 [19 Cal.Rptr.3d 872].) Where the trial court's decision of a mixed question of fact and law implicates the constitutional right to confront a witness at trial, we apply de novo review. (*Id.* at p. 471.) To excuse the witness from live testimony, the infirmity must be sufficiently problematic that it makes live testimony at trial " 'relatively impossible,' " not merely inconvenient. (*Ibid.*) "Relatively impossible" includes "the relative impossibility of eliciting testimony without risk of inflicting substantial trauma on the witness." (*Id.* at pp. 471–472.)

Schallenberg's conditional examination testimony did not, in and of itself, really hurt defendant. Rather, Schallenberg helped defendant by denying her prior statements to the police. Nevertheless, her conditional examination

ground of section 1335, subdivision (b), because trial counsel may have considered that provision limited to death penalty cases, a view arguably supported by *People v. Jurado, supra*, 38 Cal.4th 72, which sought to harmonize sections 1335 and 1336 and spoke of section 1335, subdivision (b), as a release from the historical prohibition against conditional examinations of prosecution witnesses in capital cases. (*People v. Jurado, supra*, at pp. 110–113.) In any event, defendant's claim of ineffective assistance of counsel would be more appropriately decided in a habeas corpus proceeding. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

testimony opened the door to admission of her hearsay statements to the detective (identifying defendant in the ampm photo and relating his admission that he was there) as prior inconsistent statements, and those hearsay statements did hurt defendant.

Defendant believes there was insufficient evidence of infirmity to relieve Schallenberg from having to testify in front of the jury. However, there was testimony of the infirmity from a doctor who had actually treated Schallenberg. Additionally, the trial judge, who had the opportunity to view Schallenberg in person and observe her demeanor, described her uncontrollable shaking and distress when she entered the courtroom, before the videotaping began. Although the witness eventually settled down, as we observe in our own viewing of the videotape, we defer to the trial court's observations of the witness before the videotaping began (undisputed by defendant). The fact the witness was able to testify in the presence of several persons does not mean she would have been able to testify if jurors and the public were added to the mix.

We conclude the trial court did not err in finding Schallenberg unavailable and using the conditional examination in lieu of live testimony. There was no need to permit defendant to engage in voir dire of Schallenberg.

 As to defendant's contention that the conditional examination, outside of the presence of the jury and the public, violated his right to a public trial, we disagree. A conditional examination is not part of the trial; rather, it is a deposition taken in cases where a material witness is unavailable to testify in person at trial. (§ 1345;[10] *People v. Watkins* (1996) 45 Cal.App.4th 485, 488 [53 Cal.Rptr.2d 13].) The videotaped examination was played for the jury in open court, with no exclusion of the public.

We conclude no reversible error occurred regarding the conditional examination of Schallenberg.

V.–VIII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[10] Section 1345 provides that if a conditional examination is videotaped, "that video-recording may be shown by either party at the trial if the court finds that the witness is unavailable as a witness within the meaning of Section 240 of the Evidence Code."

*See footnote, *ante*, page 156.

## DISPOSITION

The trial court is directed to correct the abstract of judgment by (1) striking the Penal Code section 1202.45 fine, and (2) deleting the reference to the three strikes law. The trial court shall forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

Hull, J., and Butz, J., concurred.

A petition for a rehearing was denied June 3, 2009, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 12, 2009, S173629. Moreno, J., and Corrigan, J., did not participate therein.