Filed 5/20/14  In re J.C. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>J.C.,<br><br>　　　Defendant and Appellant. | A136774, A137952<br><br>(Sonoma County<br>Super. Ct. No. 36196-J) |

J.C., a minor, appeals the juvenile court's orders entered after a contested jurisdictional hearing.  The juvenile court found that appellant committed one count of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1) (count 1)), and two counts of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4) (counts 2 and 3)).  The juvenile court found true the corresponding gang enhancement.  Appellant contends he cannot be convicted of two assaults (counts 1 and 2) against the same victim[2] because he engaged in a single, continuous course of conduct.  Alternatively, he claims remand for resentencing is required because the juvenile court erroneously failed to stay the sentence imposed on count 1 under section 654.  We affirm.

---

[1]  All further undesignated statutory references are to the Penal Code.

[2]  Count 3 relates to assaultive conduct committed against a different victim.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Charged Offenses*

On June 16, 2012, about 12:00 or 1:00 p.m., a family consisting of a couple (Father and Mother, also sometimes referred to as husband and wife) and their two daughters, ages 14 and 18,[3] attended a family birthday party at a park in Santa Rosa. The birthday party took place at the same time and in the same general area as a car show. The car show included a beer drinking contest, Aztec dancers, and musical performances by various rappers. Some car show attendees smoked marijuana, wore red, and yelled "VSRN" throughout the day. Rap songs also mentioned "VSRN." VSRN is the acronym for Varrio Santa Rosa Norte, which is a subset of the Norteno criminal street gang.

Many of the car show attendees were gang members who were familiar or friendly with the father. Father was not a gang member, but had associated with gangs when he was young. Members of his and his wife's family had been involved in gangs.

Sometime between 4:30 and 5:30 p.m., the older daughter left the birthday party to go to a Quinceanera. She walked to the front of the park with her sister, the younger daughter, and her sister's boyfriend. Father joined the young people on the walk because he was concerned for his daughters' safety.

Approximately 30 minutes before escorting the older daughter to meet her friend, Father noticed that appellant, appellant's father Guadalupe C., and a group of other males had been watching him intently. Some of the members of the group wore red clothing; appellant wore a black t-shirt and khaki shorts. Father, both daughters, and the younger daughter's boyfriend walked by the group on their way to the front of the park. Appellant was standing in front of Guadalupe, when Guadalupe called out to Father using Father's nickname.

Father thought someone in the group knew him, so he, along with his daughters and the boyfriend, walked toward the group. As they approached the group, Father

---

[3] For privacy protection, we shall refer to the victims in their familial capacities only.

asked Guadalupe, "Do I know you?" Guadalupe said, "Hey [nickname] . . . you're [nickname] . . . I heard you're a snitch." Appellant then walked up to Father and said, "Who are you?" Father answered by stating his nickname. Appellant repeatedly called Father a "snitch" and clenched his fists as if he was about to hit Father. The older daughter tried to protect Father by stepping between appellant and Father. Mother soon joined in once she saw the verbal altercation between appellant and her family.

Based on the group's hostile demeanor and the fact that he was being called a snitch, Father thought some sort of physical altercation was about to occur. He said to Guadalupe, "So this is what you're about? You do this when I am walking with my kids and at a family function? . . . And you got youngsters putting your work in for you? . . . You got something to do with me? You should be conducting that with me. Why you got a youngster in front of you?" Guadalupe responded, "I heard you were a snitch," as 18 to 20 more people gathered around him. Guadalupe then gestured to a heavyset man with a ponytail and the number "415" tattooed on his arm. The man punched the older daughter in the face, knocking her to the ground. Father was enraged and attacked the man who had hit his daughter.

Meanwhile, appellant moved as if he was preparing to hit someone. His arms were clenched; he was two to three feet away from Father. As Father fought on the ground with his daughter's attacker, several people set upon Father, hitting and kicking him. The older daughter then got up from the ground and fought against Father's assailants. Father heard several people say, "VSRN" during the attack. The younger daughter saw appellant hit Father.

At some point, the crowd began to disperse. Father stopped hitting the older daughter's assailant and stood up unsteadily. Six or seven seconds later, someone came up behind Father, said, "Are you okay, homey," and hit him on the back of the head with a glass beer bottle. Father fell motionless on his back. The back of his head was bleeding and he was unable to get up or defend himself. As Father fell, about 15 individuals jumped him and beat him in concert. Many of the individuals wore red, and

some of them shouted, "VSRN." The younger daughter said, "That's my dad. Leave him alone." Someone said, "fuck your dad."

The younger daughter threw herself on top of Father and protected his head. The group kicked and punched the younger daughter in the head, arms, and the sides of her ribs as she shielded Father with her body. Someone said, "VSRN will fight anybody." Appellant hit Father and tried to hit Mother as she attempted to pull him off her husband.

The younger daughter spoke to Father as he lay on the ground, but he did not move or respond. Someone yelled, "call the cops," and the assailants dispersed. The man who had hit Father with the bottle said, "This is Doc Holliday" (one of the rappers), and he drove away in a white truck. The beating had lasted about 10 minutes.

After the assailants left, police and paramedics arrived. Father and both daughters were taken to the hospital. Father had swelling and cuts on his face and received stitches on his nose. He could not focus his eyes, had blood on his lip, cheek, and forehead, and his verbal responses were delayed. His body, forearms, chest, forehead, and stomach were bruised. The cut on the back of his head was an inch long and about an eighth of an inch deep. His knees were scraped from fighting on gravel and asphalt, he had cuts on his hands, and he had to wear a neck brace. At the time of the jurisdictional hearing, Father was experiencing dizzy spells every morning, had problems maintaining his balance, and was suffering from depression brought on by the attacks.

As a result of being punched, the older daughter's jaw swelled and she could not open it. Her legs were scraped from being thrown onto gravel and her ribs were bruised. She also had a laceration behind one of her ears and bruises on her shoulder and the back of her neck. The younger daughter had lumps on her head and bruises on her arms. At the time of the jurisdictional hearing, she still experienced intermittent pain in her head.

Father knew Guadalupe, but did not recognize him on June 16, 2012. The first time they met, Guadalupe had overheard Father's cousin call Father a snitch because he had spoken with the police regarding a narcotics investigation. Father had also testified against Norteno gang participants in a trial.

### B.      *Gang Evidence*

Detective John Cretan of the Santa Rosa Police Department testified as a gang expert and the investigating officer in the case.  According to Cregan, Carl Hasty, Robert Flett, also known as "Doc Holliday," Rubin Tovar, Juan Tovar, and Tavo Collazo, also known as "Little Conner," were active participants in the assaults on Father.  All of those individuals were members of the Norteno gang.  Tovar was a registered gang member who spoke openly about his affiliation with VSRN.  Hasty was involved in a Norteno gang, had numerous gang-related tattoos, and had served a prison sentence for a gang-related drive-by shooting.  Collazo, or "Little Conner," had dozens of gang-specific tattoos, was open about his gang affiliation, and had gang-related convictions.  Flett, or "Doc Holliday," also was a well-known VSRN member.

Cregan opined that the assaults on Father and the younger daughter were gang-related because some of the perpetrators wore red clothing, a red flag with a bird symbol was hoisted nearby, and some perpetrators called Father a "snitch."  According to Cregan, one of the "cardinal rules" in the gang community is that one cannot assist police investigations, even if one is the victim of a crime at the hands of a rival gang member.  An individual who has provided information to law enforcement or cooperated with law enforcement on a case is considered to be a "rat" or "snitch" by gang members.  The term "snitch" is one of the most derogatory terms that can be used in the gang world.  Someone who is labeled a snitch is likely to be violently assaulted.  Someone who is not a gang member, but who associates with gangs, may become a snitch by communicating with law enforcement.  Cregan opined that Father was assaulted because he had testified against Norteno gang members in a trial.

Cregan testified that once a gang fight begins, other gang members in the vicinity are obligated to join in the altercation whether they started it or not.  If a gang member does not join in the fight, he will lose status in the gang.  Active participation in an assault benefits a gang member's status and the gang as a whole because gang members wish to be feared and respected in the community and by other gangs.

Cregan opined that appellant was an active gang participant who was closely associated with VSRN. According to Cregan, appellant was involved in several gang-related assaults prior to the assaults on Father. In 2009, appellant and several other known Nortenos participated in a fight against rival Sureno gang members that involved over 15 juveniles. One of the Sureno gang members was stabbed repeatedly during the incident. Then, in March 2010, appellant and two other Norteno gang participants, one of whom was appellant's younger brother, repeatedly kicked and punched a rival Sureno gang participant while shouting gang challenges. Appellant admitted his involvement in the crime. Also, in December 2010, appellant witnessed rival Sureno gang members stab his older brother, a member of VSRN. Appellant refused to speak to police about the incident. He explained, "I can't be a snitch. I won't talk."

## C.     *Juvenile Court Proceedings*

On July 23, 2012, the Sonoma County District Attorney filed an amended wardship petition (Welf. & Inst. Code, § 602, subd. (a)), alleging that appellant committed assault with a deadly weapon—a bottle—upon Father. (§ 245, subd. (a)(1) (count 1)), assault by means of force likely to produce great bodily injury upon Father (§ 245, subd. (a)(4) (count 2)), and assault by means of force likely to produce great bodily injury upon the younger daughter (§ 245, subd. (a)(4) (count 3)). The petition further alleged a great bodily injury enhancement, a five-year gang enhancement, and a 10-year gang enhancement for count 1, a great bodily injury enhancement, a four-year gang enhancement, and a 10-year gang enhancement for count 2, and a four-year gang enhancement for count 3.

On August 1, 2012, the juvenile court dismissed the great bodily injury enhancement for count 1 at the prosecutor's request. On August 9, 2012, following a contested jurisdictional hearing, the court found counts 1, 2, and 3 true. Despite previously dismissing the great bodily injury enhancement for count 1, the court also found the great bodily injury and the 10-year gang enhancements true for counts 1 and 2, and the four-year gang enhancement true for count 3. On September 10 and 13, 2012, the juvenile court corrected its findings with regard to count 1 by deleting the great bodily

6

injury and the 10-year gang enhancements and imposing the five-year gang enhancement. The court committed appellant to the Division of Juvenile Justice (DJJ) for 90 days for a diagnostic evaluation.

Appellant filed a timely notice of appeal on October 3, 2012.

On February 5, 2013, after appellant completed his DJJ commitment, the juvenile court declared wardship and placed appellant in probation camp. The court set the maximum time of confinement at 293 months. The court awarded a total of 328 days of precommitment custody credit. Appellant filed a second notice of appeal on February 19, 2013. On March 4, 2013, we consolidated the appeals.

## II. DISCUSSION

### A. *Conviction on Two Counts*

Appellant contends the prosecution impermissibly split a single assault into two counts because the charged offenses involved a single course of conduct. (See, e.g., *People v. Oppenheimer* (1909) 156 Cal. 733, 740 (*Oppenheimer*).) We disagree.

#### 1. Applicable Law

Section 245, subdivision (a)(1), criminalizes "an assault upon the person of another with a deadly weapon or instrument other than a firearm . . . ." Section 245, subdivision (a)(4), criminalizes "assault upon the person of another by any means of force likely to produce great bodily injury . . . ." Section 240 defines assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." "[A]ctual causation of injury . . . is not a required element for assault" and "[n]o actual touching is necessary" for conviction. (*People v. Golde* (2008) 163 Cal.App.4th 101, 122; *People v. Wyatt* (2012) 55 Cal.4th 694, 702.) To be found guilty of assault, all the defendant has to do is perform "an act likely to result in a touching, however slight, of another, in a harmful or offensive manner. [Citation.]" (*People v. Wyatt*, at p. 702.) "Where the assault is committed with a deadly weapon, or with force likely to produce great bodily injury, the . . . assault is complete upon the attempted use of the force." (*People v. Yeats* (1977) 66 Cal.App.3d 874, 878.)

7

A defendant may be convicted of assault with a deadly weapon on an aiding and abetting theory of liability. (See, e.g., *In re Jose D.* (1990) 219 Cal.App.3d 582, 584-585.) " '[A]n aider and abettor is a person who, "acting with (1) knowledge of the unlawful purpose of the perpetrator[,] and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 136.) Further, " '[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable. [Citation.]' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*), italics omitted.)

Section 954 provides that " '[a]n accusatory pleading may charge . . . different statements of the same offense' and 'the defendant may be convicted of any number of the offenses charged.' " (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1474 (*Johnson*), quoting § 954.) "Unless one offense is necessarily included in the other [citation], multiple convictions can be based upon a single criminal act or an indivisible course of criminal conduct . . . ." (*People v. Benavides* (2005) 35 Cal.4th 69, 97, citing § 954.)

Whether a defendant may receive multiple convictions where they are based upon multiple blows during a single continuous assault is a question of law subject to independent review. (See, e.g., *Johnson*, *supra*, 150 Cal.App.4th at p. 1474 [issue of whether the defendant could receive multiple convictions of corporal injury to a cohabitant based on multiple blows in the course of a single continuous assault subject to independent review].) "[T]he proper analysis involves a determination of when the charged crime is completed." (*Ibid*.)

Once a court determines when the charged crime is completed, it "review[s] the record in the light most favorable to the judgment to determine whether it discloses

8

substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [the] defendant guilty beyond a reasonable doubt of the . . . crimes he challenges . . . . [Citation.]" (*Johnson*, *supra*, 150 Cal.App.4th at p. 1477.)

### 2. Analysis

Section 954 generally permits multiple convictions, although section 654 prohibits multiple punishments for the same act or omission. In *People v. Sloan* (2007) 42 Cal.4th 110, our Supreme Court explained the distinction between multiple convictions arising out of the same act (which are permissible) and multiple punishments for the same act (which are prohibited). (*Id.* at p. 116.) " 'When section 954 permits multiple convictions, but section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited. [Citations.]' [Citation.]" (*People v. Sloan*, at p. 116.)

In *Johnson*, *supra*, 150 Cal.App.4th 1467, the defendant was convicted of three counts of corporal injury on a cohabitant arising from a single incident in which he hit a woman with whom he was living on the nose, eyes, and mouth; choked her and held her by her throat against the wall and struck her on the neck, arm, lower back and leg; and stabbed her in the left arm. (*Id.* at p. 1471.) *Johnson* rejected the defendant's claim that multiple convictions were improper under section 954 because his conduct constituted a single continuous assault. *Johnson* found that "the crime described by section 273.5 is complete upon the willful and direct application of physical force upon the victim, resulting in wound or injury. It follows that where multiple applications of physical force result in separate injuries, the perpetrator has completed multiple violations of section 273.5." (*Johnson*, at p. 1477.) As a result, *Johnson* concluded that the evidence supported three separate convictions for a violation of section 273.5 consisting of one offense when defendant beat the victim, another when he held her by the throat, and a third when he stabbed her arm. (*Johnson*, at p. 1477.)

9

Here, as *Johnson* illustrates, under section 954, appellant's charge and conviction of two counts of assault (one with a deadly weapon, one with force likely to produce great bodily injury) is permissible.

Nonetheless, appellant, relying on various inapposite authority, claims he could be convicted of only one assault. Appellant claims this case is controlled by *Oppenheimer*, *supra*, 156 Cal. 733 and *People v. Mitchell* (1940) 40 Cal.App.2d 204 (*Mitchell*). We disagree. Preliminarily, both *Oppenheimer* and *Mitchell* were decided long before the rules regarding continuous course of conduct and independent objectives were formulated and, as such, neither case had occasion to discuss these rules.

In *Oppenheimer*, *supra*, 156 Cal. 733, the defendant took an iron window weight from his cell and escaped from it. (*Id.* at pp. 736-737.) He then went to the prison dining room and attacked another inmate who was cutting bread by hitting the inmate on the head with the window weight, grabbing the knife from the inmate, and stabbing him several times. (*Ibid.*) *Oppenheimer* observed, "We think it is manifest that there was but a single assault shown by this evidence . . . . The mere fact that two weapons are used does not necessarily show two assaults. . . . The evidence . . . in this case tended to show one continuous transaction, one assault in which two weapons were used." (*Id.* at p. 740.) The defendant in *Oppenheimer* was charged with and convicted of a single count of assault, and the issue on appeal was whether the evidence supported the crime as charged and proved. (*Id.* at pp. 739-740.) The Supreme Court answered that question affirmatively. (*Id.* at p. 740.) Here, by contrast, appellant was charged with and convicted of two assaults, and substantial evidence supports both convictions. (See § B.2 *post*.) The fact that two closely related attacks *can* be characterized a single assault does not support the conclusion that two more separate and distinct attacks *must* be characterized as a single assault.

Similarly, in *Mitchell* the defendant attacked the victim by hitting him on the head, and a very short time later attacked the victim again, using a beer bottle to strike the victim on the side of the head. (*Mitchell*, *supra*, 40 Cal.App.2d at p. 207.) The defendant complained his conviction for two assaults violated the double jeopardy clause of the

10

California Constitution. (*Id.* at p. 210.) *Mitchell,* citing *Oppenheimer,* rejected this contention, finding "there was in fact but a single assault." (*Mitchell*, *supra*, 40 Cal.App.2d at p. 211.) "The evidence concerning the blow struck by [the defendant] with his fist was merely testimony regarding a portion of a transaction which culminated in the assault with the bottle. . . . . There was but one assault, although two blows, one with the fist and one with a bottle, were struck." (*Ibid.*)

*Mitchell* is not controlling here because we are not faced with a double jeopardy issue. Furthermore, as we have explained, the fact that a defendant who inflicts more than one blow *can* be charged with and convicted of a single assault does not compel the conclusion that a series of blows *must* be characterized as a single assault.

Equally unavailing is appellant's reliance on *Medina*, *supra*, 46 Cal.4th 913. In *Medina*, two defendants were involved in a gang assault that culminated in the shooting of the victim. (*Id.* at pp. 916-917.) A jury found the defendants guilty of first degree murder as aiders and abettors. (*Id.* at pp. 917, 919.) The Court of Appeal reversed their convictions "on the ground there was insufficient evidence that the nontarget crimes of murder and attempted murder were a reasonably foreseeable consequence of simple assault, the target offense they had aided and abetted." (*Id.* at p. 919.) Our Supreme Court disagreed with the Court of Appeal. (*Id.* at p. 928.) The court reasoned that the gun violence was foreseeable because "although [one defendant] argue[d] that the fistfight and shooting were not one uninterrupted event, but rather two separate incidents, the evidence showed that [the defendants] did not consider the fight to be over and that the shooting resulted directly from that fight. Eyewitnesses testified that the events happened very quickly, in a matter of seconds, not minutes. After [a third party] had broken up the fight, someone yelled, 'get the heat,' just before the shooting." (*Id.* at pp. 923-924.)

Appellant appears to rely on the *Medina* court's reasoning regarding the foreseeability of gun violence for the proposition that he committed only one assault. *Medina*, however, does not address the propriety of multiple convictions for multiple acts of violence committed during the course of a continuous assault. Rather, the issue before

the court was whether substantial evidence supported the murder and attempted murder convictions based on aider and abettor liability. (*Medina*, *supra*, 46 Cal.4th at pp. 919-921.) Accordingly, *Medina* is inapposite. (See *People v. Jennings* (2010) 50 Cal.4th 616, 684 [" 'It is axiomatic that cases are not authority for propositions not considered' "].)

Finally, appellant also relies on *State v. McDonald* (1877) 67 Mo. 13. In *McDonald*, the defendant struck the victim with tongs, a hammer, and an axe handle during an altercation and was indicted for one count of assault with intent to kill using all three weapons. (*Id*. at pp. 15, 17-18.) He sought to quash the indictment, arguing that he could not have committed the offense as charged because "three weapons were charged to have been used at the same time." (*Id*. at pp. 15-16.) The court upheld the validity of the indictment, finding that it charged one continuous assault with multiple weapons rather than two or more assaults in one count. (*Id*. at p. 18.)

Obviously, *McDonald* is not controlling here as we "are not bound by cases from other states. [Citation.]" (*People v. Mays* (2009) 174 Cal.App.4th 156, 167.) Further, *McDonald* is inapposite because, like *Oppenheimer* and *Mitchell*, it does not address the issue of whether multiple acts of violence may support multiple assault convictions and predates the relevant California case law. (*Johnson*, *supra*, 150 Cal.App.4th 1467; see also *People v. Harrison* (1989) 48 Cal.3d 321, 334.)

None of the cases appellant cites stands for the proposition that only one theory of conviction can be charged for one or more acts that are part of a single violent encounter. To the contrary, section 954 permits such charging schemes. Instead, the cases appellant relies on illustrate that whether more than one attack is to be viewed as one assault rests upon the factual circumstances of each case. Thus, although appellant's attack upon the victim was carried out over a very short period of time, there were two separate assaults with different instrumentalities, one with appellant's fist and one with the bottle, resulting in numerous injuries to the victim.

12

### B.    *Sentencing*

Alternately, appellant argues that he cannot be sentenced for the two assaults against Father because they were part of an indivisible course of conduct.  Thus, according to appellant, the juvenile court should have stayed the term of confinement pertaining to the assault with a deadly weapon finding.  We disagree.

### 1.    **Applicable Law**

Section 654 states, in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)

Section 654 prohibits multiple punishment not only for an "act or omission" but also for a single, indivisible course of criminal conduct.  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1208.)  " 'It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.] . . . [I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.]' [Citation.]" (*People v. Hicks* (1993) 6 Cal.4th 784, 789.)  "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct. [Citations.]" (*People v. Perez* (1979) 23 Cal.3d 545, 551, fn. omitted.)

Section 654 applies to consecutive or aggregated terms calculated by a juvenile court pursuant to Welfare and Institutions Code section 726, subdivision (c). (*In re Asean D.* (1993) 14 Cal.App.4th 467, 474.)  "The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination.  Its findings on this question must be upheld on appeal if there is any substantial evidence to support them.

[Citations.] 'We must "view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" [Citation.]' [Citation.]" (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312-1313.) Here, the juvenile court made no express factual findings with respect to the application of section 654. Nonetheless, on appeal we will sustain the court's implied factual determination if supported by substantial evidence. (See *People v. Osband* (1996) 13 Cal.4th 622, 730.)

### 2. Analysis

Appellant contends his sentence for assault with a deadly weapon (count one) should have been stayed because that offense and the assaultive conduct that formed the basis of the count two conviction were part of an indivisible course of criminal conduct.

Substantial evidence supports the trial court's implicit finding that appellant committed two distinct offenses of assault—one by aiding and abetting an assault with a deadly weapon, and the other by engaging in conduct with force likely to produce great bodily injury. During the incident at the park, appellant instigated the attack on Father by yelling to gang members that Father was a snitch. In this charged atmosphere, fueled by alcohol, it was reasonably foreseeable that violence would erupt. (See *Medina*, *supra*, 46 Cal.4th at p. 920.) First, a man punched Father's older daughter in the face. Then, as Father was on the ground fighting her attacker, several people started hitting and kicking him. Father's younger daughter saw appellant hit her father. Father and the older daughter's attacker eventually stopped fighting. Six or seven seconds after Father stood up, someone came up behind him and hit him on the back of his head with a glass bottle. As Father lay motionless on the ground, appellant, along with numerous individuals, hit Father. By calling Father a snitch, appellant aided and abetted the assault with a deadly weapon (count 1). Appellant also personally engaged in assaultive conduct when he hit Father (count 2). Thus, although the assault with a deadly weapon (count 1) and the assault with force likely to cause great bodily injury (count 2), were committed during the same incident, evidence that each offense furthered separate criminal objectives permitted the juvenile court to impose separate sentences. (See *People v. Latimer*, *supra*,

14

5 Cal.4th at pp. 1212, 1216 [approving rule that § 654 authorized punishment in cases finding "separate, although sometimes simultaneous objectives under the facts"].)

Appellant maintains that he was involved in a group attack, in which he and others used fists to assault Father, while one man used a bottle. According to appellant, "they all . . . had the single intent of striking [Father] so as to cause him physical harm." Criminal behavior, however, may be punished separately where the criminal acts are the products of separate acts of force. (*Harrison*, *supra*, 48 Cal.3d at p. 338; *People v. Trotter* (1992) 7 Cal.App.4th 363, 368.) In the present case, appellant not only incited the attack on Father, he also participated in the beating. In other words, appellant was not content to merely assault Father, he also wanted others to attack Father. Thus, the separate punishments that the juvenile court imposed do not offend section 654.

## III. DISPOSITION

Judgment affirmed.

_____
REARDON, J.

We concur:

_____
RUVOLO, P. J.

_____
HUMES, J.

15